## STATE OF CONNECTICUT *v.* DAVID M. POLLITT (12431)

PETERS, C. J., HEALEY, SHEA, DANNEHY and CALLAHAN, Js.

Argued January 8—decision released April 22, 1986

*William F. Dow III,* for the appellant (defendant).

*Guy W. Wolf III,* assistant state's attorney, with whom, on the brief, was *Arnold Markle,* state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendant, David M. Pollitt, was found guilty after a jury trial of the crime of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A)[1] and of the crime of sexual assault in the first degree in violation of General Statutes § 53a-70 (a).[2] This appeal followed.

The principal issue on appeal is whether the trial court erred in denying the defendant's motions for a mistrial or a continuance where allegedly exculpatory material, which could show another person committed the crimes charged and which had been specifically requested and wrongfully withheld by the state, was discovered midtrial and the exculpatory witness could not be located on short notice. At trial the principal issue was the identity of the perpetrator of the crime. The defendant also claims that the trial court erred: (1) in failing to instruct the jury accurately on the

---

[1] General Statutes § 53a-92 (a) (2) (A) provides: "A person is guilty of kidnapping in the first degree when he abducts another person and when . . . (2) he restrains the person abducted with intent to (A) inflict physical injury upon him or violate or abuse him sexually."

[2] General Statutes § 53a-70 (a) provides: "A person is guilty of sexual assault in the first degree when such person compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person."

dangers of eyewitness identification; (2) in its manner of "marshalling" the evidence presented in its instructions; (3) in its admission of the evidence of his blood type; and (4) in denying his pretrial motions to suppress the victim's identification. Because of our action on the principal issue, we need not discuss the remaining issues at this time. We remand for further proceedings in accordance with this opinion.

Because of our determination to remand, a full recitation of the evidence before the jury is not necessary. The length of the trial and the number of witnesses who testified,[3] however, does not permit us to capsulize those circumstances adduced at trial that demonstrate the background for our remand.

The following is some of the evidence that was adduced before the jury. On October 17, 1981, M, a twenty-five year old woman, left her Wallingford apartment at about 4:45 p.m. for a bicycle ride. She cycled past the defendant on Grieb Road near Durham Road and he yelled at her asking for directions. M stopped her bicycle, went back to him and asked him what he was looking for. He said: "I'm going to rape you, lady." With his right hand and arm he grabbed her from "around [her] back" and grabbed her bicycle with his left hand. He dragged her and the bicycle off the road into the field where he discarded the bicycle. He then sexually assaulted her.

After the assault, she ran to the house across the street for help. Gail DeNegris opened the door,

---

[3] Commencing on October 5, 1982, an evidentiary hearing was held, extending over two days on the defendant's motion to suppress the victim's identification of the defendant. This motion was denied on October 7, 1982.

The presentation of evidence began on October 11, 1983, and continued, with some interruptions, up to and including October 18, 1983. The state presented eighteen witnesses and the defense presented twelve witnesses. More than forty exhibits were admitted into evidence. The jury rendered its verdict on October 18, 1983.

whereupon M told her that she had just been sexually assaulted. DeNegris observed M's disheveled clothing and a cut on the side of her nose and detected the odor of a man's cologne. After a time, DeNegris called the Wallingford police at 5:39 p.m. Officer Thomas Francolino, who was dispatched by radio, was the first police officer to arrive at the DeNegris home. When he received the radio call to go there, he was approximately one and one-half to two miles away and it took him four minutes to get there. He arrived at approximately 5:43 p.m. He found the victim to be extremely distraught. Police officers located M's bicycle in the field where it had been discarded. Fingerprints taken from the crossbar of the bicycle were later identified as those of the defendant.[4]

The police made inquiries in the area of the crime shortly after its commission. Beverly Steinberg, a state's witness who was an area resident, said that she saw a dark green AMC Pacer automobile "sitting" on Grieb Road just before its intersection with Durham Road at "around 5:00 o'clock" on October 17, 1981.[5] Roland Sperzel, a state's witness who drove a truck transporting fill for construction on October 17, 1981, made "fifteen, twenty trips" that day "going up Grieb Road or Durham Road and going around the corner past Grieb." That day he saw "[a] Pacer, green '76 to '78" parked headed west on Durham Road where "usually they don't park" sometime between 1 and 6 p.m. At one point he saw a "guy walking away from the car with a red flannel shirt on . . . a plaid shirt."

---

[4] Detective Thomas Hanley sent the latent fingerprint lifts from the bicycle crossbar to the F.B.I. in Washington for further verification. At the trial, Burwell T. Driver, an F.B.I. fingerprint specialist, also identified the defendant's left index fingerprint. In addition, he also identified the defendant's left middle and left ring fingers from the latent prints forwarded by Hanley.

[5] A 1975 Pacer automobile was registered to the defendant on October 17, 1981. Steinberg did not get the license number from the Pacer she saw.

Asked to describe him, Sperzel said: "Five-five—six foot. But I was looking down at him so I really don't know how tall he was. He was medium build" and his hair was brown. The teletype put out by Detective Sergeant William Butka described the assailant as, inter alia, a white male, "five-eight to five-nine with husky build" and with short brown hair parted in the middle. George Mellor and Joseph Stankwitz were witnesses produced by the defendant. Mellor's home is on the corner of Grieb Road and Durham Road and he can see the I-91 overpass from his home. He was outside his home on the afternoon of October 17, 1981, probably from 4 p.m. to "5:30, maybe 6:00 p.m." While his activities about the outside of his home did not permit him to view the overpass for all of that time, he never saw a parked motor vehicle on the overpass. Stankwitz, whose home is diagonally opposite from Mellor's, had left his home on October 17, 1981, about 3:30 p.m. and had driven over the I-91 Durham overpass but did not see a vehicle parked there. Daryl Perkins, a defense witness, who lived on Old Durham Road across from the area known as "Three Fields," testified that on October 17, 1981, he saw a white car parked in Three Fields about "[p]robably 5:00 o'clockish in the afternoon" or "[f]ive or six at the latest." He did not see anybody around the car and acknowledged that it was not uncommon to see cars parked at that place. He saw hunters "go over there" and that date was during "hunting season time." Mrs. Agostini, another defense witness, testified that on October 17, 1981, she was driving to her home on Durham Road about 5 or 5:30 p.m. from her usual hairdressing appointment. As she proceeded easterly on Grieb Road and before she came to the I-91 Durham overpass, she noticed a "kind of battered" lime green car that "wasn't new" parked about five feet off the road near a large cornfield. She also said that she saw no one near the car—that hunt

ers go into that particular cornfield and that it was the hunting season at that time. She saw no cars parked on Durham Road as she proceeded to her home.

Detective Patricia Miranda was with M on October 18, 1981, when efforts were undertaken to make a composite of M's assailant. Miranda testified that M "did not like the composite" and M herself said that she "did not like the composite when it was completed," and was "[n]ot at all" satisfied with it. She also looked at numerous mug shots ("at least two hundred, perhaps more") but did not make an identification. The defendant's photo was not among those shown to M at this time. On April 22, 1982, six months after the assault, M was shown an array of eight photos of bearded males at her home by Detective Theodore Milewski of the Wallingford police department.[6] Although she did not say that she was certain, she did indicate to Milewski that photo No. 417 "resembled" her assailant but that she could not positively identify him from a photograph, that "[she] would have to see the person." Photo No. 417 was a photo of the defendant. A number of days after her meeting with Milewski, M met with Miranda who showed her photo No. 417 again. On August 5, 1982, M went to the Wallingford police department and viewed a videotape of six bearded males. She immediately identified the fifth participant, the defendant, as her assailant.

Against this background, we turn to the sworn written statement of David Isola given to the Wallingford

---

[6] M testified that Detective Miranda called her prior to the April 22, 1982, viewing of the array to say that they had some photos they wanted her to look at. On cross-examination, she said she did not remember if Miranda then said that "she had . . . a suspect." Later, on cross-examination of M, the following took place: "Isn't it true that last week [at a suppression hearing] when you testified you indicated that before you saw the photos, [Detective] Patricia Miranda called you and said that there was a suspect whose photograph they wanted to show you or words to that effect?" She answered: "I may have said it that way, yes."

police on October 20, 1981. Among other things, his statement says that at about 5:30 p.m. on October 17, 1981, he heard on his police scanner radio that police cars were dispatched to Grieb Road on a signal that he ascertained was a rape. He "heard" on the scanner that they found a bike and were "checking out a white car somewhere." Isola then went to George Hodge's house, which was on Durham Road near Grieb Road, and he and Hodge decided to "go out and look for the guy." He had his scanner with him and he heard the police broadcast a description of the "guy" and at the time all he knew was that it was a male about his height. This was about 6 p.m. He drove around for a while with Hodge and then they came upon Isola's younger brother Randy, Greg Hodge and Jimmy Briars as they were walking along Old Durham Road. David Isola told Randy that they were "looking for a guy that raped some chick" whereupon Randy told him that there was a car in "Three Fields" with a guy in it. After describing the borders of "Three Fields," his statement states that he drove up there and saw a car parked way up in the back of the third field. He said it was "a white-yellowish car with red primer paint on the rear driver's side quarter panel." He believed it was a Toyota Celica 4-door car and while it was a "newer car," it was "all beat up" and it was "like a squarish type car." Isola approached the car in which a white male was sitting while George Hodge remained in Isola's car. He said that the white male was of "medium build, 160–175, about 5′8″ tall. He had brown hair, which was parted in the middle and feathered back. It was like a disco haircut, brushed back away from his ears, so his ears were exposed. He had a mustache cut away from his nose. The mustache wasn't that thick. It was dark. The mustache was short, not going past the end of his lips. This guy looked like he never shaved his sideburns, they seemed long, not thick. I think this guy had dark eyes.

He seemed Italian or Hungarian in looks. He was about 21–22 years old. This guy was wearing a flannel plaid jacket, or thick shirt on, it was brown or maroon for the basic color." Isola was only a foot or two from this man who appeared "nervous and tense" and "never said anything." Isola told this man that he was Choate (School) security and the unidentified male, whose car engine had been running, drove off. Isola pursued this car through the field but the fleeing car drove "right over" a mound of dirt that blocked off the driveway and entered Old Durham Road going easterly. Isola tried to follow him but his car "got hung up on a stump or something."

M was examined and cross-examined about the description of her assailant. On direct examination, she was asked to describe him "at the time [she] observed him." She said that at that time she thought he "was a white male in his late 20's, early 30's possibly, four to five inches taller than me [she was five-five] . . . brown hair . . . with a mustache [it was trimmed, taken care of] . . . his hands were a little bit dirty . . . fingernails were a little bit short . . . . [He was of] medium build . . . a little bit dark. . . ." She reiterated that she did not describe him as "husky." On direct examination, she also said that she felt that "he had very short fingernails and might have been a person who bit his fingernails . . . it looked like he had grease on his hands or in his pores . . . like a garage person." She said that he was wearing jeans and a brown flannel shirt, "button down shirt" which was plain and had long sleeves.

The defense first learned of Isola's statement or of anything about his involvement on October 12, 1983, upon the conclusion of the direct testimony of Detective Patricia Miranda at which time defense counsel was given a sixteen page report or statement made by her. During the luncheon recess, defense counsel reviewed

the Miranda report which contained certain information obtained from Isola on October 20, 1981. Defense counsel claimed to the court that "if this isn't exculpatory or tending to lead to information that will be exculpatory, I don't know what is." He argued that he tried unsuccessfully to contact Isola during the recess and sought to get Isola's actual statement.[7] The trial court denied his request as well as the defendant's motion for a mistrial which was apparently premised on the state's failure timely to disclose the Isola statement. On the last day of trial, the defense argued that it had been unsuccessful in subpoenaing Isola and that a deputy sheriff had made five trips to Isola's home to locate him. Defense counsel had marked, with the court's permission, the sheriff's sworn return on the subpoena referring to those efforts. At that time, the court denied his motion for a continuance for further time to locate Isola.

After the guilty verdict, the defendant made a motion for a new trial, alleging, inter alia, error in the trial court's refusal to dismiss the charges "due to the prosecutor's failure to turn over *Brady* material in a timely fashion" and in denying his request for a continuance to obtain the presence of Isola, "whose testimony would exculpate [him]." No evidence was taken at that hearing and the motion was denied.

The defendant's defense was structured around his alibi and his claim that someone else was the perpetrator of the crimes charged. He presented evidence at the trial going to those matters.

On September 14, 1982, over a year prior to the trial, the defendant had filed a detailed "Motion for Discov-

---

[7] Later in the trial the defense called Detective Thomas Hanley, who had testified earlier for the state. His later testimony fairly established that he was the police officer who took Isola's written statement on October 20, 1981. The defense attempts to elicit from Hanley what Isola had told him were defeated by the sustaining of the state's objection of hearsay.

ery" upon which the court acted on November 3, 1982. Citing Practice Book § 741, entitled "Information and Materials Discoverable by Defendant as of Right," the court's order granted, inter alia, paragraph 12 of the discovery motion.[8]

The defendant, pointing to the court's order granting his discovery motion and claiming under *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and its progeny that the state suppressed "[t]his highly exculpatory evidence," makes a number of arguments. He claims that the police report summarizing Isola's account was accidentally discovered by him during the trial almost a year after the court granted his discovery motion pursuant to Practice Book § 741. He also asserts that the state was on notice because of the specificity of his request and that such a statement was to be turned over to him pursuant to its continuing duty to do so under that order. To support his claim, the defendant refers to the United States and Connecticut constitutions, to General Statutes § 54-86c and to Practice Book §§ 734 and 741 (1). He

---

[8] *The defendant's motion for discovery stated in relevant part:*

"The defendant, David M. Pollitt, by his undersigned counsel, respectfully moves this Court, pursuant to Sections 741, 743, 744, 745, 750 and other relevant sections of the Connecticut Practice Book, the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States, Article 1, Sections 7, 8 and 9 and other relevant provisions of the Constitution of the State of Connecticut, and *Brady* v. *Maryland,* 373 U.S. 83 (1963) and its progeny, to order the prosecuting authority to disclose in writing the existence of and to allow the defendant to inspect, copy, photograph and have reasonable tests made on any of the following relevant materials, all of which are essential and necessary to enable him to prepare a defense:

\* \* \*

"12. All material now known to the State or which may become known, or which through diligence may be learned from the investigating officers or any witnesses in this case or any related case, which is exculpatory in nature or favorable to the accused or which may lead to exculpatory material, including, but not limited to:

"(a) All evidence known to the State consistent with the innocence of this defendant, including that which is corroborative of any statements given

contends that Isola's observations would have had a "material, direct bearing" on his guilt or innocence because it would allow him to "[present] an alternative theory of the crime consistent with [his] defense of alibi and mistaken identification which [he] attempted to raise." Stressing his assertions that the victim's identification of him was "suspect," he also contends that Isola's information was "vital" and that it could establish that he was not the assailant.[9] Moreover, Isola's testimony, he says, would be inconsistent with the state's theory of the case that "[he] fit the description perfectly and owns a green car similar to the car observed near the crime scene." The defendant contends it was error for the court to deny his motion for a mistrial because of the claimed suppression of Isola's statement as well as the denial of a continuance to attempt to locate Isola.[10]

to law enforcement authority by this defendant, his family, or any other witnesses regarding his whereabouts on the day the crime was alleged to have occurred.

"(b) The statements of any and all witnesses, whether oral, written or otherwise recorded, that are contradictory of or inconsistent with the State's contention that this defendant committed the crime alleged.

"(c) The statements of any and all witnesses, whether oral, written or otherwise recorded, that are contradictory of or inconsistent with other statements of witnesses, whether oral, written or otherwise recorded, including, but not limited to:

"(i) a description of the physical appearance, voice, clothing, etc. of the alleged assailant, including any scars, marks, tatoos, or disfigurements;

"(ii) a description of any motor vehicle alleged to be connected with the instant offense, including the license plate numbers, partial or complete.

"(d) The statements of any and all witnesses, whether oral, written or otherwise recorded, which place persons other than this defendant at or near the scene of the crime. . . ."

[9] In his brief, the defendant anticipates the state's argument that Isola's testimony would not make any difference because of the fingerprint evidence adduced at the trial. He argues that the "faulty procedures" used by Wallingford police fingerprint personnel, the failure to retain intact the bicycle from which the prints were lifted and "especially" the failure to photograph the latent fingerprints "severely called into question the claimed source of the latent prints."

[10] The defendant asserts in his brief that Isola was not available to testify at the trial and that he could not be located on short notice and that

The state counters that no material evidence favorable to the defendant was suppressed and that the trial court did not err in denying the defendant's motion for a mistrial or a continuance. Arguing that the defendant has not made the required showing of suppression, the state maintains that the defendant's brief "concedes" that he received "an extensive police report" and Isola's statement about his claimed observation of a car and its occupant. In addition, the state points out that it also gave to the defendant a copy of Miranda's interview with the other two occupants of Isola's car, Gregory Hodge and George Hodge. The latter two "interviews" were not signed or sworn to by the two young men and recite that both interviews took place on October 10, 1983, during the trial. Moreover, the state argues that the challenged evidence was neither favorable to the defendant nor material to his guilt, pointing out, inter alia, that "[a]t best, the defendant sought to show [by the use of the statement] that about an hour after the crime more than a mile away a person was observed [by Isola] whose description had some similarities to the assailant described by [the victim M]." Pointing to certain evidence of Steinberg, Sperzel and the assailant's description by M and Isola, the state asserts that even disregarding the "contrary evidence" of George Hodge and Gregory Hodge, the "Isola claim" would neither have aided the defendant's case nor detracted from the state's case. The state further argues that the trial court properly denied the motion for the mistrial and the continuance. In that connection, it mentions that Isola was not alone when he made his claimed observations but that his brother Randy, George Hodge and Gregory Hodge were with him and argues that Isola was, therefore, only one of

he "made extensive efforts to locate and subpoena Isola to offer his testimony," including the sheriff's five visits to Isola's home where the sheriff spoke to Isola's mother, his brother Randy and his sister.

four witnesses who could have been called. At no time, the state continues, did defense counsel suggest that he had tried to subpoena or would call any of the other young men. Finally, the state argues that the information supplied by Isola would have been irrelevant under the case of *State* v. *Giguere,* 184 Conn. 400, 405, 439 A.2d 1040 (1981).

Our concern at this point is whether there was a suppression of *Brady* material as claimed and if there was, what are its constitutional consequences, including, but not limited to, the denial of the continuance by the trial court. In *Brady* v. *Maryland,* supra, 87, the United States Supreme Court said that "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." See *Moore* v. *Illinois,* 408 U.S. 786, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972). "In *Moore,* the court said that '[t]he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.' *Moore* v. *Illinois,* supra, 794–95; *State* v. *Doolittle,* 189 Conn. 183, 197, 455 A.2d 843 (1983); *People* v. *Hedrick,* 192 Colo. 37, 40–41, 557 P.2d 378 (1976)." *State* v. *Green,* 194 Conn. 258, 263, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). *Brady,* of course, was aimed at ensuring that an accused receives a fair trial. *Brady* v. *Maryland,* supra, 87–88; see *United States* v. *Bagley,* 473 U.S. 667, 105 S. Ct. 3375, 3379–81, 87 L. Ed. 2d 481 (1985); *United States ex rel. Smith* v. *Fairman,* 769

F.2d 386, 392 (7th Cir. 1985). In *United States* v. *Agurs,* 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), in explicating the materiality prong of *Brady,* the court said that the prosecutor does not violate his constitutional duty of disclosure "unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." See *State* v. *Green,* supra, 263–64.

The recent case of *United States* v. *Bagley,* supra, seems[11] to fashion a new formulation of the *Agurs* test for materiality. In *Bagley,* Justice Blackmun wrote: "We find the *Strickland* [v. *Washington,* 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674, reh. denied, 467 U.S. 1267, 104 S. Ct. 3562, 82 L. Ed. 2d 864 (1984)] formulation of the *Agurs* test for materiality sufficiently flexible to cover the 'no request,' 'general request,' and 'specific request' cases of prosecutorial failure to disclose evidence favorable to the accused: The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to

---

[11] In *United States* v. *Bagley,* 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985), Justice Blackmun wrote the opinion in which Justice O'Connor joined. Justice White, joined by Chief Justice Burger and Justice Rehnquist, wrote an opinion "concurring in part and concurring in the judgment." Justice Marshall filed a dissenting opinion in which Justice Brennan joined and Justice Stevens filed a separate dissenting opinion. Justice Powell took no part in the decisions of the case.

*Bagley,* to date, has apparently not been hailed as a beacon in this area. For example, in *United States* v. *Ben M. Hogan Co.,* 769 F.2d 1293, 1299 (8th Cir. 1985), the court said: "A majority of the Supreme Court now seems to agree that irrespective of the specificity of a request for evidence made by the defense, for purposes of a *Brady* inquiry, such ' "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." ' " The Fifth Circuit Court of Appeals, in addressing what showing *Brady* required where the defendant makes a specific request, said: "Finally, a very recent decision [*United States* v. *Bagley*] handed down since we heard oral argument in today's case, throws further—if somewhat flickering—

undermine confidence in the outcome." *United States* v. *Bagley,* supra, 682; see *United States* v. *Agurs,* supra, 109–10 ("mere possibility"). Evidence may be said to be favorable when it might tend to lead the jury to entertain a reasonable doubt that did not otherwise exist. See *State* v. *Green,* supra, and cases cited therein.

In order to establish a violation under *Brady* and its progeny, this defendant has the burden of demonstrating not only that the state suppressed information that was favorable and material to him but also that it was not disclosed upon request. See *State* v. *Gradzik,* 193 Conn. 35, 40–41, 475 A.2d 269 (1984), and *State* v. *Falcone,* 191 Conn. 12, 17, 463 A.2d 558 (1983). The circumstance that claimed *Brady* material was disclosed *during,* and not *after,* trial hardly precludes the application of *Brady* which declared the right to material and favorable evidence as part of the fundamental right to a fair trial. *Brady* v. *Maryland,* supra, 87; *State* v. *Dickens,* 437 A.2d 159 (Del. 1981); see *State* v. *Miner,* 197 Conn. 298, 304, 497 A.2d 382 (1985). *Brady's* due process basis, therefore, requires a determination of when disclosure must be made to ensure a fair trial.

light on the area." *Lindsey* v. *King,* 769 F.2d 1034, 1041 (5th Cir. 1985). In discussing a *Brady-Agurs* problem, the Seventh Circuit Court of Appeals said: "[T]he Supreme Court's recent decision in *United States* v. *Bagley* . . . suggests that there is now a single standard of materiality . . . ." *United States ex rel. Smith* v. *Fairman,* 769 F.2d 386, 393 (7th Cir. 1985). The majority in *United States* v. *Pflaumer,* 774 F.2d 1224 (3d Cir. 1985) stated that in *Bagley,* the Supreme Court had "clarified" the legal standard involved, but the dissent, addressing the "clarification" posture of the majority, said that so to characterize *Bagley* "is generous to a fault" and that "it seems appropriate to suggest that from the perspective of a judge obliged to exercise the review function announced in *Bagley* the majority has created a monstrosity." *United States* v. *Pflaumer,* supra, 1240, 1244.

For a case employing *Bagley* in rejecting a *Brady* claim where the "suppressed" statement was found to contain "only cumulative impeachment material" therefore making it "altogether improbable that its production would have changed the jury's verdict," see *United States* v. *McKenzie,* 768 F.2d 602, 610 (5th Cir. 1985).

*United States* v. *Higgs,* 713 F.2d 39, 43 (3d Cir. 1983), cert. denied sub nom. *Kemp* v. *United States,* 464 U.S. 1048, 104 S. Ct. 725, 79 L. Ed. 2d 185 (1984). The unmistakable tone of *Brady* is that evidence required to be disclosed must be disclosed at a time when it can be used. See, e.g., *United States* v. *Shelton,* 588 F.2d 1242, 1247 (9th Cir. 1978), cert. denied, 442 U.S. 909, 99 S. Ct. 2822, 61 L. Ed. 2d 275 (1979); *United States* v. *Elmore,* 423 F.2d 775, 779 (4th Cir. 1970); *State* v. *Packard,* 184 Conn. 258, 277–78, 439 A.2d 983 (1981). "No denial of due process occurs if *Brady* material is disclosed . . . in time for its effective use at trial." *United States* v. *Higgs,* supra, 44; *State* v. *Green,* supra, 259; *State* v. *Dickens,* supra. It must, nevertheless, be pointed out that "[a] delayed disclosure [of exculpatory material] by the prosecution is not *per se* reversible error." *United States* v. *Kaplan,* 554 F.2d 577, 580 (3d Cir. 1977).

Whether the tardy disclosure of *Brady* material fairly requires a continuance or a delay in order to make effective use of such matter is essentially a factual question in each case. See *United States* v. *Higgs,* supra, 43–44; *United States* v. *Kopituk,* 690 F.2d 1289, 1339 (11th Cir. 1982), cert. denied, 463 U.S. 1209, 103 S. Ct. 3542, 77 L. Ed. 2d 1391 (1983); see also *State* v. *Beckenbach,* 198 Conn. 43, 47, 52, 501 A.2d 752 (1985). The focus is not on the fact of nondisclosure, but the impact of the nondisclosure on the jury's verdict. See, e.g., *United States* v. *Kubiak,* 704 F.2d 1545, 1550 (11th Cir.), cert. denied, 464 U.S. 852, 104 S. Ct. 163, 78 L. Ed. 2d 149 (1983); *United States* v. *Provenzano,* 615 F.2d 37, 49 (2d Cir.), cert. denied, 446 U.S. 953, 100 S. Ct. 2921, 64 L. Ed. 2d 810 (1980). The effect then of disclosable evidence should be viewed in terms of its likely effect upon those on whom the outcome rests—the jury. See, e.g., *United States* v. *Librach,* 609 F.2d 919, 921–22 (8th Cir. 1979), cert. denied, 444 U.S. 1080, 100 S. Ct.

1032, 62 L. Ed. 2d 764 (1980); *Ostrer* v. *United States,* 577 F.2d 782, 788 n.5 (2d Cir. 1978), cert. denied, 439 U.S. 1115, 99 S. Ct. 1018, 59 L. Ed. 2d 73 (1979); *Cannon* v. *Alabama,* 558 F.2d 1211, 1216 n.11 (5th Cir. 1977), cert. denied, 434 U.S. 1087, 98 S. Ct. 1281, 55 L. Ed. 2d 792 (1978); *State* v. *McDowell,* 310 N.C. 61, 310 S.E.2d 301 (1984); see also *State* v. *DeSantis,* 178 Conn. 534, 548, 423 A.2d 149 (1979). Submission to the factfinder carries out the promise of *Brady* and its progeny by its fair trial guarantee that an accused has constitutional access through the prosecution to evidence that is favorable and material to guilt or punishment. *California* v. *Trombetta,* 467 U.S. 479, 485, 104 S. Ct. 2528, 81 L. Ed. 2d 413 (1984); *United States* v. *Agurs,* supra, 107–108; *Brady* v. *Maryland,* supra, 87.

We have chronicled at some length certain evidence that was before the jury, certain applicable legal principles, and the arguments of the state and the defendant directed to the important issues raised by the defendant's *Brady* claim. The appellate record before us is not, however, amenable to meaningful appellate review on the *Brady* issue. This is so because of, inter alia, relevant fact-bound determinations necessary to be made to accomplish ultimate appellate resolution of this issue. This court does not find facts. See, e.g., *Pelc* v. *Danbury,* 166 Conn. 364, 366, 349 A.2d 825 (1974); *Gormley* v. *Panuzio,* 166 Conn. 1, 2, 347 A.2d 78 (1974). The record before us, therefore, must accordingly be augmented by an evidentiary hearing at the trial level for the ascertainment of those facts which will furnish the basis for the answers to the questions for which we remand this case. There can, of course, be no question but that the supervision of a case on appeal to this court is in the Supreme Court. Practice Book § 3096; *State* v. *Gonzales,* 186 Conn. 426, 436, 441 A.2d 852 (1982); *State* v. *Ostroski,* 184 Conn. 455, 460, 440 A.2d

166 (1981); *State* v. *McCarthy,* 167 Conn. 472, 477, 356 A.2d 165 (1975). For the reasons set out above, we remand this case, sua sponte, for further proceedings. See *State* v. *Ostroski,* supra, 461.

We, of course, intimate no view on any of these issues to be resolved by the trial court on remand. We do not think that this court can or should vacate the defendant's conviction at this time and order a new trial because the defendant's rights are fully protected by our remand to the trial court with the direction to hold an evidentiary hearing consistent with this opinion. This will preserve not only the defendant's opportunity to seek further appellate review on the augmented record ordered today in our supervisory capacity but also the right of the state to such review. See Practice Book § 3060D.

On remand, the trial court must resolve one or possibly two questions as the result of the evidentiary hearing we order. It must first determine the issue of whether the state suppressed, as the defendant claims, *Brady* material that was favorable and material to the defendant. It is directed to make in writing those findings of fact and conclusions of law upon which it bases that determination, whatever it may be. In the event that it resolves that issue against the defendant, this court will then, in its supervisory capacity, upon the filing of those findings and conclusions, proceed to dispose of this appeal. In the event, however, that the trial court resolves this issue in favor of the defendant, the trial court must set out its findings of fact and conclusions of law by an analysis of the issue of whether it was harmful error under all the circumstances to have denied the defendant's motion for a continuance and/or mistrial in order to have a fair opportunity to evaluate and investigate that *Brady* material for meaningful use at the trial. These additional findings and conclusions would, it seems to us, include but not necessarily be

limited to, any efforts that the defendant made or should have made in order to use the *Brady* material once it became known to him as well as the prejudice, if any, found to have resulted to him because of the time it was disclosed to him. The prejudice, if any, should be evaluated in light of whatever efforts it is found that he in fact made, or should have been expected to have made, to use it properly. The availability of Isola as a witness is one factor that should be explored. The trial court after having made its findings of fact and conclusions of law on the *Brady* issue, for which this remand is ordered, shall promptly file such findings and conclusions with the clerk of this court for our review. See *State* v. *Lafferty,* 191 Conn. 73, 76–77, 463 A.2d 238 (1983); *State* v. *Ostroski,* supra, 460–61.

Finally, we want to emphasize that in remanding this case for the limited purpose set out in this opinion, we intimate no view at all on the ultimate merits of the issues discussed in this opinion or of any other of the defendant's claims of error which we may later be called upon to decide.

The case is remanded for further proceedings in accordance with this opinion.

In this opinion the other judges concurred.