STATE OF CONNECTICUT *v.* JEROME MONTEETH
(13316)

HEALEY, SHEA, GLASS, COVELLO and HULL, Js.

Argued April 15—decision released July 5, 1988

*William M. Bloss,* special public defender, with whom, on the brief, was *William F. Dow III,* special public defender, for the appellant (defendant).

*Susan C. Marks,* deputy assistant state's attorney, with whom, on the brief, was *Roland Fasano,* assistant state's attorney, for the appellee (state).

GLASS, J. The defendant, Jerome Monteeth, was charged in a substitute information with one count of first degree robbery in violation of General Statutes § 53a-134 (a) (4),[1] and one count of criminal attempt to commit first degree robbery in violation of General Statutes §§ 53a-49 (a) (2)[2] and 53a-134 (a) (4). After a trial to a jury, the defendant was found guilty of both charges. The defendant was sentenced by the trial court to a total effective sentence of fifteen years imprisonment, suspended after eleven years, with five years probation. The defendant appeals from the judgment of conviction.

---

[1] General Statutes § 53a-134 (a) (4) provides in relevant part: "ROBBERY IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of robbery in the first degree when, in the course of the commission of the crime or of immediate flight therefrom, he or another participant in the crime . . . (4) displays or threatens the use of what he represents by his words or conduct to be a pistol, revolver, rifle, shotgun, machine gun or other firearm; except that in any prosecution under this subdivision, it is an affirmative defense that such pistol, revolver, rifle, shotgun, machine gun or other firearm was not a weapon from which a shot could be discharged . . . ."

[2] General Statutes § 53a-49 (a) (2) provides: "CRIMINAL ATTEMPT: SUFFICIENCY OF CONDUCT; RENUNCIATION AS DEFENSE. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

On appeal, the defendant raises four issues, claiming that: (1) he was denied a fair trial because the procedures used to obtain his identification were unnecessarily suggestive and led to a reasonable likelihood of mistaken identification; (2) the trial court erred in refusing to permit cross-examination on the issues of the weaknesses in eyewitness identification in general, and in this case in particular; (3) the state failed to make a timely disclosure of certain exculpatory material; and (4) the destruction of notes containing exculpatory material mandated a dismissal or the striking of the testimony of Officer Joseph Redente and William Reynolds. We find no error.

The evidence adduced during the suppression hearing and jury trial reveals the following facts: On December 9, 1986, the Reverend William Reynolds was conducting a bible study class at the Faith Refuge Church of Christ in New Haven. Reynolds' wife, Lorene Reynolds, and church member Sara McFadden were present. At approximately 8:30 p.m., William Reynolds responded to a knock at the back door of the church. At the door, he encountered the defendant, who asked him to step outside, and then pulled a gun from his clothing and demanded money. Reynolds gave the defendant two one dollar bills and some loose change. He recognized the defendant as having come to the church with another man the previous week during the weekly bible class held on Tuesday evenings.

Lorene Reynolds opened the door to see why her husband had not returned inside the church. The defendant ordered her to get back inside the building. She went inside and told McFadden that a man with a gun was outside the church. The defendant then attempted to enter the Reynolds' car that was parked in front of the church. Lorene Reynolds again opened the church door, and asked the defendant if he wanted money. The defendant followed her inside, where he saw McFadden

run away from him and briefly pursued her. He then returned to where the Reynoldses were standing. Lorene Reynolds offered the defendant a check, which he refused, and then gave the defendant the keys to their car. After the defendant drove away, the Reynoldses called the police.

Officer Redente arrived at the church and was given a description of the defendant by William Reynolds, which he relayed to the police dispatcher for broadcast. The robber was described as: a black man in his twenties, about six feet, two inches tall, with a heavy build, dark skin, a mustache and a medium afro, wearing a blue jacket and blue jeans. Approximately twenty minutes later, the police found the Reynolds' car abandoned on a nearby street. While the police were searching the car they noticed a man who fit the description of the perpetrator walking down the street toward the police and the Reynolds' car. The police followed the man for a few minutes and then stopped him, frisked him, and placed him in the patrol car. Several minutes later William Reynolds was brought to the scene where he identified the defendant as the perpetrator.

The police then took William Reynolds to the church to pick up his wife so they could make formal statements at police headquarters. Reynolds told his wife that the police had caught the perpetrator. At the station Lorene Reynolds identified the defendant as the perpetrator in a one person show-up. The police took formal taped statements from the Reynoldses separately.

Approximately five months later, the Reynoldses individually identified the defendant in a line-up that had been requested by the defendant. Prior to trial, on motion by the defendant, the trial court held a hearing to determine whether to suppress any in or out-of-court identifications of the defendant by the Reynoldses.

The defendant's motions were denied. Both William and Lorene Reynolds identified the defendant as the perpetrator during the trial.

I

The defendant's first claim is that the trial court erred in failing to suppress the out-of-court identification of the defendant by the witness Lorene Reynolds. The defendant contends that the identification resulted from unnecessarily suggestive police procedures, that it was unreliable, and that its admission violated his constitutional right to due process of law.

It is well settled that " ' "[i]n determining whether identification procedures violate a defendant's due process rights, the required inquiry is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive, and second, if it is found to be so, it must be determined whether the identification was nevertheless reliable based on an examination of the 'totality of the circumstances.' " ' " *State* v. *Mayette*, 204 Conn. 571, 581, 529 A.2d 673 (1987); *State* v. *Ramsundar*, 204 Conn. 4, 10, 526 A.2d 1311 (1987); *State* v. *Theriault*, 182 Conn. 366, 371–72, 438 A.2d 432 (1980). The state has conceded that the station house show-up where Lorene Reynolds identified the defendant as the robber was unnecessarily suggestive. The state argues, however, that an unnecessarily suggestive identification procedure may produce an identification that is sufficiently reliable to be admitted into evidence.

Thus, our inquiry is directed to the reliability of Lorene Reynolds' identification. " 'In determining whether an identification is reliable in the "totality of circumstances," the corruptive influence of the suggestive procedure is weighed against "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy

of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977) . . . .' " *State* v. *Mayette,* supra, 583.

Under the totality of the circumstances, Lorene Reynolds' identification of the defendant was reliable. First, she had three opportunities to view the defendant. She came to the door twice, and on the latter occasion asked him if he wanted money, and he followed her inside the church office where she offered to write him a check. She then gave him the keys to the Reynolds' car.

The second factor is Lorene Reynolds' degree of attention. Although she conceded in cross-examination that her attention was not focused upon the defendant during all three of the opportunities she had to view him, she did testify that she "saw him real good," when she first viewed him at the door.

The accuracy of the witness' prior description is the third *Brathwaite* factor. Lorene Reynolds' tape recorded statement that she gave at police headquarters described the defendant as short, with a clear, smooth complexion, loose curly hair and big eyes. She stated that he was wearing a black jacket and brown pants, and noted that at the time she viewed him in the show-up, he was wearing blue pants and a blue jacket. She also stated that she recognized him as someone she had seen previously at the church. Although this description is not entirely consistent with that given by her husband, these discrepancies implicate the weight, not the admissibility of the evidence. *State* v. *Ledbetter,* 185 Conn. 607, 615, 441 A.2d 595 (1981).

The next factor is the level of certainty demonstrated at the confrontation. In this case, Lorene Reynolds viewed the defendant for one minute and then stated

that he was the robber. The defendant argues that this time span indicates some uncertainty in her identification. We are not persuaded by this argument. The fact that she looked at the defendant for one minute prior to declaring that he was the robber does not necessarily mean that she was uncertain about her identification. Rather, it is equally plausible that she wanted to examine the defendant carefully before accusing him of committing a criminal act.

Finally, the short span of time between the crime and the show-up supports the reliability of the identification. These factors support the trial court's finding that the identification of the defendant by Lorene Reynolds was reliable.

We must, however, weigh these factors against the corrupting effect of the admittedly suggestive identification. There is no question that a one man show-up was unnecessary under these circumstances, and that Lorene Reynolds may have been influenced by her husband's statement, made in the car enroute to the police station, that the police had "caught the guy" who had robbed them. Nonetheless, we are persuaded that the identification was properly admitted into evidence. Lorene Reynolds never indicated any uncertainty in her identification of the defendant. For example, she noted that the defendant was wearing different clothes in the show-up than those he had been wearing during the robbery, indicating that she was able to make careful observations of the defendant. The trial court could reasonably have found that the influence of the show-up and her husband's statement to her was minimal and that the identification procedure did not result in "a very substantial likelihood of irreparable misidentification." *State* v. *Ramsundar*, supra, 13. We conclude that the trial court did not err in denying the defendant's motion to suppress the out-of-court identification by Lorene Reynolds.

## II

The defendant's second claim is that the trial court's refusal to permit the cross-examination of two witnesses violated his sixth amendment right to confrontation and fourteenth amendment right to due process. Specifically, he claims that the trial court erred in refusing to permit the cross-examination of William Reynolds and Officer Robert Lanza, an officer involved in the investigation, on the issue of the identification of the defendant. We disagree.

"The sixth amendment to the United States constitution confers upon a defendant the right to be confronted with the witnesses against him. A significant aspect of the right of confrontation is the cross-examination of adverse witnesses ' "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the [witnesses]." ' *State* v. *George*, 194 Conn. 361, 365, 481 A.2d 1068 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 963, 83 L. Ed. 2d 768 (1985); *Davis* v. *Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Because the core value protected by the confrontation clause is the enhancement of the truth-seeking process; see *State* v. *Jarzbek*, 204 Conn. 683, 692–93, 529 A.2d 1245 (1987); '[c]ross-examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted.' *State* v. *Wilson*, 188 Conn. 715, 720, 453 A.2d 765 (1982); *State* v. *Corley*, 177 Conn. 243, 246, 413 A.2d 826 (1979). Where reliability is not directly implicated, however, the scope of cross-examination is within the discretion of the trial court. *State* v. *Vitale*, 197 Conn. 396, 402–403, 497 A.2d 956 (1985); *State* v. *Gaynor*, 182 Conn. 501, 510–11, 438 A.2d 749 (1980)." *State* v. *Weidenhof*, 205 Conn. 262, 270–71, 533 A.2d 545 (1987).

With respect to the testimony of William Reynolds that was disallowed by the trial court, review of the transcript of his testimony indicates that the question objected to by the state, and sustained by the trial court, was later asked in virtually the same form and was answered by the witness.[3] Thus, the evidence sought to be elicited was cumulative and the trial court did not err in sustaining the state's objection.

The second limitation on cross-examination occurred during the testimony of Lanza, with respect to questions regarding his training and experience in the area of eyewitness identifications.[4] The trial court sustained the state's objections on the ground that the questions had no probative value. We agree with the trial court that these questions did not relate to any facts in issue at the trial.[5]

[3] Defense counsel asked William Reynolds: "Isn't it possible, reverend, that your description of the person who robbed you today as you sit before our jury is influenced at least a little bit by the information you received since December 7th in viewing Mr. Monteeth? Isn't that possible?" The state objected on the ground that the question had no probative value. Defense counsel then asked: "And would you also agree with me that under the trying circumstances of this case having seen someone that you have committed yourself to as being the perpetrator that there's a possibility that the hair—time you has [sic] influenced what you're telling the jury now?" Reynolds answered the question.

[4] The trial court sustained the state's objections to the following questions: "And you know from your training and from your experience that eyewitness identifications in and of themselves are susceptible to problems, fair?"; "there have been occasions in your own department where you have a positive identification with a witness who's [sic] sincere and certain and it turns out that the person was in custody so they could not possibly have committed a crime, fair?"

[5] With respect to the first question objected to by the state, Lanza was not qualified as an expert witness on the reliability of eyewitness identifications. Moreover, we have rejected the claim that a defendant is entitled to expert testimony on the issue of eyewitness identification. *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986). With respect to the second question objected to by the state, review of the record indicates that there was no evidence in this case that there had been a positive identification of a suspect who turned out to have been in police custody at the time the robbery occurred.

Except for the noted exceptions, the court permitted the defendant to cross-examine the two witnesses broadly regarding the identification of the defendant. We conclude that the trial court did not abuse its discretion in ruling as it did.

## III

The defendant's third claim is that he was prejudiced by the state's failure timely to disclose certain exculpatory evidence. He argues that the disclosure of a six page typed statement of Lorene Reynolds, after she had testified at the suppression hearing, but prior to the trial, violated the principles of *Brady* v. *Maryland,* 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and constituted reversible error.

We examine this claim in the context of these additional facts: On the evening of the robbery, Lorene Reynolds gave a taped statement to the police, wherein she described the perpetrator of the robbery. At the suppression hearing, she was questioned regarding her identification of the defendant. The trial commenced on May 4, 1987, with the calling of the state's first witness, William Reynolds. Late in the day on May 4, the defendant was furnished with a copy of the statement made by Lorene Reynolds to the police on the night of the robbery. No proceedings were held on May 5. At the start of trial on May 6, the defendant moved for sanctions, pursuant to Practice Book § 747,[6] on

---

[6] "[Practice Book] Sec. 747. ——SANCTIONS FOR FAILURE TO COMPLY

"If the prosecuting authority fails to comply with Sec. 740, the judicial authority may, on motion of the defendant or on his own motion, grant appropriate relief, which may include one or more of the following:

"(1) Requiring the prosecuting authority to comply;

"(2) Granting the defendant additional time or a continuance;

"(3) Relieving the defendant from making a disclosure required by Sec. 756, prohibiting the prosecuting authority from introducing specified evidence, or dismissing the charges; or

"(4) Entering such other order as he deems proper."

the ground that the statement contained exculpatory material and inconsistent statements and should have been disclosed earlier. The defendant requested that the suppression hearing be opened so that he could cross-examine Lorene Reynolds using the report, and requested that the case be dismissed or, alternatively, that the testimony of her and her husband be stricken from the record and that a one week continuance be granted to allow further preparation in light of the new material.

Following lengthy arguments by counsel, the trial court ruled that the defendant could open the suppression hearing and voir dire Lorene Reynolds prior to any in-court identification of the defendant by her. The trial court denied the defendant's motion for a continuance, finding that he had received the statement on May 4, a Monday, and had had two days in which to consider how it would be used. After this ruling, the defendant conducted a voir dire examination of Lorene Reynolds regarding the inconsistencies between her statement to the police and her testimony at the original suppression hearing. No effort was made to open the cross-examination of William Reynolds, although the trial court ruled that the defendant was entitled to do so. The trial court again found that the identification was reliable and denied the motion to suppress. Finally, Lorene Reynolds testified at trial, and on cross-examination was questioned extensively regarding the statement she had made to the police. The statement was admitted into evidence as an exhibit and was read aloud to the jury.

The gravamen of the defendant's claim is that he was prejudiced because he was unable to use Lorene Reynolds' statement in interviewing witnesses and cross-examining witnesses. He claims error in the denial of his request for a continuance. The defendant characterizes the evidence in question as material fall-

ing within the purview of *Brady* v. *Maryland,* supra. Even assuming that this characterization is accurate, we find no error.

We have recently reiterated: "In *Brady* v. *Maryland,* supra, 87, the United States Supreme Court stated that 'suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' Later, in *Moore* v. *Illinois,* 408 U.S 786, 794–95, 92 S. Ct. 2562, 33 L. Ed. 2d 706, reh. denied, 409 U.S. 897, 93 S. Ct. 87, 34 L. Ed. 2d 155 (1972), the court stated: '[t]he heart of the holding in *Brady* is the prosecution's suppression of evidence, in the face of a defense production request, where the evidence is favorable to the accused and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.' See *State* v. *Green,* 194 Conn. 258, 263, 480 A.2d 526 (1984), cert. denied, 469 U.S. 1191, 105 S. Ct. 964, 83 L. Ed. 2d 969 (1985). Impeachment evidence as well as exculpatory evidence falls within *Brady's* definition of evidence favorable to an accused. *United States* v. *Bagley,* 473 U.S. 667, 676, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Giglio* v. *United States,* 405 U.S. 150, 154–55, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Brady* v. *Maryland,* supra, 87; *United States* v. *Polizzi,* 801 F.2d 1543, 1553 (9th Cir. 1986).

"In illuminating the standard of materiality that must be met, the United States Supreme Court said in *United States* v. *Agurs,* 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), that 'the prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial.' See also

*State* v. *Pollitt*, [199 Conn. 399, 412, 508 A.2d 1 (1986) (*Pollitt I*)]. Thereafter, in *United States* v. *Agurs*, supra, the court fashioned a two-tiered framework for determining materiality. With reference to evidence that the defense specifically requested, the standard was whether the evidence 'might have affected the outcome of the trial.' Id., 104. With reference to evidence requested generally or evidence not requested at all, the standard was that evidence was material if it 'creates a reasonable doubt that did not otherwise exist.' Id., 112. In *United States* v. *Bagley*, a divided United States Supreme Court, drawing on *Strickland* v. *Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), reformulated the materiality standard. Justice Blackmun, writing for a plurality, opined that the *Strickland* formulation of the *Agurs* standard was 'sufficiently flexible' to encompass all three circumstances of prosecutorial failure to disclose evidence favorable to the defendant, i.e., the 'no request,' the 'general request' and the 'specific request' situations. *United States* v. *Bagley*, supra, 682. The *Bagley* standard of materiality is as follows: 'The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' Id. *Bagley* thus adopted *Strickland's* 'reasonable probability' standard to assess materiality for use in prosecutorial nondisclosure situations. Therefore, there is no need to determine whether the defendant's request was specific because the standard for materiality would remain the same. Fairness, however, dictates that we recognize it as a specific request. See *State* v. *Pollitt*, supra, 408 n.8." *State* v. *Pollitt*, 205 Conn. 132, 141–43, 531 A.2d 125 (1987) (*Pollitt II*).

Thus, examining the entire record we must determine whether there is a reasonable probability that, had the

evidence been disclosed to the defense, the result of the proceeding would have been different. Id., 143. Because the defendant was given sufficient opportunity to utilize Lorene Reynolds' statement in both the suppression hearing and at trial, and because any inconsistencies contained in the statement were fully drawn to the jury's attention, we do not believe that if the defendant had received this statement at an earlier point in time, the outcome of the trial would have been different. The trial court did not abuse its discretion in refusing to grant a continuance.

## IV

The defendant's final claim is that the trial court erred in refusing to strike the testimony of Officer Joseph Redente and William Reynolds. Specifically, he claims that he was prejudiced by the destruction of written notes, taken by Redente, when interviewing Reynolds at the church on the night of the robbery.

Redente testified that he had taken notes of his initial conversation with Reynolds, and discarded them at the end of his shift on December 9, after using them to prepare a report regarding the robbery. At the trial, the defendant moved to strike the testimony of Reynolds and Redente for failure to preserve the notes. The trial court denied the motion. The defendant's claim of prejudice relates to the discrepancies in the descriptions of the perpetrator of the crime, especially insofar as the length of hair is concerned.

"A defendant may, under some circumstances, obtain police officers' records of an interview with a witness for purposes of cross-examination. Practice Book §§ 750, 752; *State* v. *Mullings,* 202 Conn. 1, 7, 519 A.2d 58 (1987); *State* v. *Hinton,* [196 Conn. 289, 299, 493 A.2d 836 (1985)]. Under Practice Book § 749, however, such disclosure is limited to the 'statements' of witnesses. *State* v. *Hinton,* supra, 300; *State* v. *Myers,* 193

Conn. 457, 470, 479 A.2d 199 (1984). Practice Book § 749 offers two alternate definitions of 'statement': '(1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement.' A police officer's notes may be subject to disclosure to the defendant for use in cross-examining the interviewed witness, provided they meet either of § 749's alternate definitions of 'statement.' They may also be discoverable to cross-examine the police officer if they are 'signed or otherwise adopted' by the officer. *State* v. *Hinton,* supra, 299–300; *State* v. *Myers,* supra; *State* v. *Anonymous (83–FG),* 190 Conn. 715, 734, 463 A.2d 533 (1983)." *State* v. *Williams,* 203 Conn. 159, 180–81, 523 A.2d 1284 (1987).

The essence of the defendant's argument is that Redente's notes constitute exculpatory material to which he was entitled under *Brady* v. *Maryland,* supra. He claims that Redente's field notes would have contained the exculpatory statements by William Reynolds that the suspect had hair much longer than the defendant's hair. There is no evidence in the record, however, that indicates that Redente's notes contained exculpatory material. Thus, the notes do not satisfy the *Brady* test, as discussed above. The defendant further claims that the state attempts to "cloud the issue" by contending that the notes destroyed by the police were not "statements" discoverable under Practice Book § 750 et seq. As made clear in *Williams,* however, an essential inquiry is whether the evidence constituted "statements." This record does not support such a claim. There is no evidence to show that Reynolds signed or otherwise adopted the notes. Moreover, there is no evidence that the notes were a "substantially verbatim" account of the incident. *State* v. *Williams,* supra, 182.

There is no error.

In this opinion SHEA, COVELLO and HULL, Js., concurred.

ARTHUR H. HEALEY, J., concurring. I join in the majority with one exception: I do not agree that the trial court properly admitted the identification testimony of Lorene Reynolds. I would rather conclude that the reliability of her identification of the defendant in the totality of the circumstances was not supported by the requisite factors set out in such cases as *Manson* v. *Brathwaite,* 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977), *Neil* v. *Biggers,* 409 U.S. 188, 199–201, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), *State* v. *Theriault,* 182 Conn. 366, 371–72, 438 A.2d 432 (1980), and *State* v. *Miller,* 202 Conn. 463, 470, 522 A.2d 249 (1987). Contrary to what the majority asserts, in my view, the inconsistencies in her identification, which included a highly impermissible show-up of the defendant, are such that they cannot in this case go to the weight of such evidence, but clearly to its admissibility. While the admission of Lorene Reynolds' identification testimony accordingly violated the defendant's due process rights; see *State* v. *Theriault,* supra; I conclude that its admission does not require a different result in the disposition of this appeal. This is so because the identification testimony of her husband, William Reynolds, which, in my opinion, is not at all drawn into question by Lorene Reynolds' identification testimony, is fully independent of her testimony.[1]

[1] I am aware that *State* v. *Gordon,* 185 Conn. 402, 420, 441 A.2d 119 (1981), cert. denied, 455 U.S. 989, 102 S. Ct. 1612, 71 L. Ed. 2d 848 (1982), holds that harmless error analysis is not used "whenever the erroneous admission of an unnecessarily suggestive and unreliable identification has violated a defendant's constitutional rights." That case, however, concerned an unreliable identification by the victim, who was the *sole* source of identification evidence. Here, the unreliable identification is to be considered in the light of the untainted and reliable identification by William Reynolds, another eyewitness who had a better opportunity to view the defendant during the robbery and made the initial identification.