[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
PROCEDURAL HISTORY
This is a habeas petition heard on remand from the Supreme Court. On February 3, 1987, following a jury trial in the Waterbury Judicial District, the petitioner was found guilty of the criminal offense of Felony Murder in violation of Connecticut General Statute 53a-54c.[1] On March 20, 1987, the petitioner was sentenced to the Commissioner of Corrections for a period of fifty years. He is now an inmate in the custody of the respondent serving the imposed sentence.
The petitioner's conviction was affirmed on direct appeal. State v. Quintana, 209 Conn. 34 (1988). Subsequently, on April 17, 1989, the petitioner brought this habeas petition. By Amended Petition dated July 5, 1990, and further amended on July 27, 1990, the petitioner claimed that his incarceration is unlawful on the basis of his assertion that he had been denied the effective assistance of trial counsel, and that he had been denied due process by the failure of the State to notify the defense that a State's witness, Gregorio Hernandez, had been promised money by Crimestoppers, Inc., (Crimestoppers) in exchange for his cooperation with the prosecution. Following an evidentiary hearing, the court, Dunn, J., granted the petitioner's request for a new trial on the basis that he had been denied the effective assistance of counsel in the underlying criminal proceedings. The decision of the habeas court was reversed and remanded on appeal. The Supreme Court found that the trial court applied an erroneous standard in determining that the petitioner had been denied the effective assistance of counsel in the underlying criminal proceedings. Quintana v. Warden, 220 Conn. 1 (1991). On remand, this court heard the habeas petition anew.
The Fourth Amended Petition dated December 30, 1996 CT Page 2966 contains four counts. The petitioner makes the following claims with respect to the underlying criminal proceedings: (1) he was denied the right to counsel; (2) he was denied the effective assistance of trial counsel: (3) he was denied due process; and, he is actually innocent of the crime of Felony Murder. In support of his first count, the petitioner alleges that he was denied counsel by trial counsel's unreasonable demand for additional counsel fees. The petitioner's second count, claiming ineffective assistance of counsel, alleges myriad acts and omissions including counsel's failure to object to certain trial evidence, failure to conduct an adequate pretrial investigation, failure to have the petitioner medically examined prior to trial in support of his claim that he sustained defensive wounds in an altercation with the victim, and failure to adequately investigate the circumstances under which a State's witness, Gregorio Hernandez, gave pretrial statements to the police. The petitioner's third count has several components. In furtherance of this due process claim, the petitioner asserts that Gregorio Hernandez had contacted Crimestoppers prior to his testimony, and that Hernandez had been told by Crimestoppers that he would receive money in exchange for his cooperation in prosecuting the charges against the petitioner, but only if Quintana were convicted. The petitioner alleges that this arrangement was not known by Quintana because his lawyer failed to conduct an adequate pretrial investigation, and also because the State failed to disclose it as exculpatory information. In this count, the petitioner alleges that the State's failure to disclose Hernandez' arrangement with Crimestoppers denied him the constitutionally-protected right to confront his accuser. Finally, as to the petitioner's actual innocence claim, he asserts that since the trial, State's witness Gregorio Hernandez has recanted his trial testimony, and that the recantation is new evidence likely to produce a different outcome at trial.
Based on the evidence adduced at trial, the court makes the following findings and order.
THE CRIMINAL TRIAL
In the underlying criminal proceedings, the State was represented by Assistant State's Attorney Peter Markle. The CT Page 2967 petitioner's attorney was Paul J. Yamin, Esq.
The State offered evidence that on the evening of March 11, 1986, the victim, Robert Chrisman, was fatally stabbed in the chest on a sidewalk near his apartment on Cherry Street in Waterbury. The victim's fiance, Kathleen Warner, testified that the victim, who suffered from epilepsy, left their apartment at approximately 7:45 p. m. to purchase cigarettes at a nearby grocery store with approximately two dollars in his possession. Responding Waterbury police officer Gene Caron testified that he found two nickels, a silver cigarette case, and a lighter near the victim's body. Another police officer, Neal O'Leary testified that he found a full pack of cigarettes and two quarters in the victim's jacket. Ms. Warner testified that neither the cigarette case nor the lighter found nearby the victim belonged to him.
Gregorio Hernandez, who was seventeen years old and had an eighth grade education at the time, testified that a few days after the stabbing, he was picked up by Quintana who was in a car with two girls, and that while in the car, Quintana bragged to him that he and a friend, Blas Oliveras, had murdered a man. Hernandez testified that Quintana told him that he and Oliveras had waited for the victim to come out of a store, that they waited for the victim while he made a phone call, that they grabbed the victim and started hitting him to get him to give them money. Hernandez stated that Quintana told him that the victim would not give them any money so they kept hitting him, and when he still would not give them money, he stabbed the victim twice. Hernandez testified that Quintana told him they had accosted the victim in an effort to get money from him to buy marijuana, and Hernandez indicated that Quintana told him that he was the only person he had told. Hernandez testified that this conversation with Quintana was in Spanish, and that it took place while he and Quintana were in the back seat of the automobile. He stated that he reported this conversation to the police on the next day. He also stated that Quintana smoked Newport cigarettes, and that he owned a silver cigarette case and a see-through lighter. He testified that he identified a cigarette case and lighter in the possession of the Waterbury police as belonging to Quintana, and he confirmed that the items, now marked as trial exhibits, were, in fact, the petitioner's. On cross examination, CT Page 2968 Hernandez stated that he had gone to the police voluntarily. He also stated that there had been no arrest warrant(s) outstanding against him when he went to the police station. Additionally, in response to defense questioning, Hernandez denied that the police had promised him anything if he gave a statement, and he denied that he had been threatened by the police.
The petitioner's (then) girlfriend, Jeannette Berman, testified that Quintana called her after 8 p. m. on the evening of March 11, 1986, and asked her to call the hospital to learn the condition of a white male with blond hair. She stated that, in this conversation, Quintana told her there had been some trouble on Cherry Street. Berman testified that, during a telephone call from Quintana on the next day, he told her that he and his friend Blas had been hanging out on Cherry Street nearby a man who was drunk when another man, with white or blond hair, got into an argument with the drunk man. She stated that Quintana told her that the blond haired man went into the store and when he came out, seeing the drunk man with him and Oliveras, the blond haired man started talking to him and Oliveras thinking that they were with the drunk man, and a fight ensued. She stated that Quintana told her that, during the fight, the victim took his jacket off and struck him with something, cutting his hand. Berman testified that Quintana told her that he then pulled his knife and stabbed the victim twice, once in the left arm and once in the chest. Berman testified that she saw Quintana a few days later. She indicated that he had called her and asked her to meet him, and that while she was driving with another female friend, they picked up Quintana on Grand Street by pre-arrangement. Berman testified that during this ride, they also picked up a friend of Quintana's, Gregorio Hernandez, who she had never met before. She testified that Hernandez joined Quintana in the back seat and they conversed in Spanish, but that she did not understand what they were saying. Finally, Berman testified that, once she was picked up by the Waterbury Police for questioning, she identified a cigarette case and lighter in their possession as belonging to Quintana.
Waterbury Police Sergeant Bart Deeley testified that on March 17, 1986, he picked up Gregorio Hernandez and brought him to the State's Attorney's office with Sergeant Frank CT Page 2969 Dest where Hernandez gave a written statement.
Waterbury Police Officer James McDonald testified that fingerprints found on the cigarette lighter and cigarette pack found at the crime scene matched the petitioner's.
Waterbury Police Officer Stephen Flaherty testified that when Quintana was booked on March 18, 1986, he was required to hold a photo board to have his photograph taken. Flaherty stated that during this process, he observed Quintana's hands, and he did not detect the presence of any injuries to either of Quintana's hands.
Arkady Katsnelson, M.D. from the office of the Chief Medical Examiner, testified that examination of the victim's body revealed abrasions on his face and chest and two stab wounds to his chest.
The defense called one witness, Darren Cook. Following Cook's assertion of his privilege against self incrimination out of the presence of the jury, the defense rested.
After counsels' closing arguments, the court charged the jury. As part of its charge, the court instructed the jury on the offense of criminal attempt to commit robbery, and indicated to the jury that in order to find criminal attempt they must conclude that the petitioner intentionally did an act which constituted a substantial step in the course of conduct planned to culminate in his commission of the crime of robbery, and that evidence of such a substantial step must be strongly corroborative of the defendant's criminal purpose. Among the examples given by the court was lying in wait, searching for, or following the contemplated victim of the crime. Petitioner's Exhibit 4, Trial Transcript 4-116, (February 3, 1987). The jury returned with a guilty verdict within an hour of the conclusion of the court's charge.
THE DIRECT APPEAL
On appeal, the petitioner argued that the State's failure to disclose the existence of criminal charges pending against Hernandez at the time of his testimony violated his due process rights. Additionally, the petitioner challenged the court's instructions concerning CT Page 2970 the crime of attempted robbery and the elements of self defense. Relevant to the petitioner's habeas claim is the court's disposition of his claim relating to Gregorio Hernandez. While the court found that, at the time of his January, 1987 testimony, there were criminal charges of assault in the first degree, threatening, and larceny in the fourth degree pending against Hernandez, the court determined that the State's failure to disclose the pendency of these charges was not material. The court found that the nondisclosure did not prejudice the defense since the trial testimony given by Hernandez was consistent with testimony he gave at the probable cause hearing when no charges were pending against him. The court stated, "In our view, the trial testimony served largely to confirm and restate the evidence given at the probable cause hearing. Further any perceived infirmities in the probative value of Hernandez' testimony because of the pending charges could easily have been cured by the rehabilitative effect of the introduction of the probable cause testimony as a prior consistent statement." State v Quintana, supra, 209 Conn. 39, 40
(1988). The court concluded, "We deem the nondisclosure insufficient to have undermined confidence in the outcome of the proceedings, and therefore the information withheld was not `material' according to the test articulated in Bagley."Id.
THE INITIAL HABEAS DECISION
While the habeas petition presented to the initial habeas court contained multiple counts, it is clear from the Supreme Court's opinion that the petition was granted on the basis of ineffective assistance of counsel. In writing for the court, Justice Covello framed the issue on appeal as, ". . . whether the habeas court applied the proper standard in reviewing the petitioner's claim of ineffective assistance of counsel." Quintana v. Warden, supra, 220 Conn. 2 (1991). Footnoted to this statement was the following comment: "The petitioner also raised a confrontation claim that is not presently before us. Furthermore, the state argues on appeal: (1) that counsel's conduct at trial did not constitute ineffective assistance of counsel; and (2) that the attorney's conduct did not prejudice the petitioner. Because of our disposition of this case on the issue of the correct standard of review, we need not decide these issues." Id. CT Page 2971
In this habeas petition, the petitioner's confrontation claim, his denial of counsel claim, his ineffective assistance claim, and his factual innocence claim are all before the court.
DENIAL OF COUNSEL
The petitioner claims that Attorney Yamin's insistence on further legal fees in order to defend him at trial effectively deprived him of counsel. The court is unpersuaded.
Attorney Yamin was privately retained by relatives of Quintana, and filed his appearance on May 7, 1986. While his recollection at the habeas hearing was unclear, he testified to his belief that he had requested a retainer of five thousand ($5000) dollars, but received a total of approximately twenty-eight hundred ($2800) dollars on behalf of Quintana to represent him. A letter from Attorney Yamin dated September 22, 1986 to Delia Quintana indicates Attorney Yamin's concern that he had not received the full retainer of five thousand ($5000) dollars, and that his fee for defending Quintana at trial would be substantially greater. In this letter, he asked Ms. Quintana to make an appointment with him to discuss the fee arrangement, and he suggested that if she was not prepared to pay his fee he would seek the court's permission to withdraw from representing Quintana. Subsequently, on January 9, 1987, Attorney Yamin wrote to Iris Quintana to inform her of the scheduling of a pretrial and to remind her that there was a balance due on the matter. Whatever lack of success Attorney Yamin may have had in collecting a fee in this matter, he continued to represent Quintana. Attorney Yamin testified credibly that he made no representations to Quintana that he would conduct a more thorough pretrial investigation in return for the payment of more fees. He did not withdraw from representation. The petitioner has failed to meet his burden of proof that he was denied counsel.
INEFFECTIVE ASSISTANCE OF COUNSEL
The petitioner's right to the effective assistance of counsel is assured by the sixth and fourteenth amendments to CT Page 2972 the Federal constitution and by Article First, Section 8 of the Connecticut constitution. In order to prove that his counsel's performance was deficient, the petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness. Aillon v. Meachum,211 Conn. 352 (1989). Competent representation is not to be equated with perfection. "The constitution guarantees only a fair trial and a competent attorney; it does not ensure that every conceivable constitutional claim will be recognized and raised." Jeffrey v. Commissioner,36 Conn. App. 216 (1994) (citations omitted). "Defense counsel's performance must be reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law." (Citations omitted; internal quotations marks omitted.) Johnson v. Commissioner,36 Conn. App. 695 (1995).
The Strickland court also gave guidance to the trial bench for its assessment of ineffective claims. The Supreme Court opined:
 Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy'. . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. CT Page 2973 (Citations omitted.) Strickland v. Washington, supra, 466 U.S. 689-90; Quintana v. Warden, 220 Conn. 1 (1991); Williams v. Warden, 217 Conn. 419
(1991); Jeffrey v. Commissioner, 36 Conn. App. 216
(1994).
With respect to the prejudice component of theStrickland test, the petitioner must demonstrate that, ". . . counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland v. Washington, supra 466 U.S. 687. Thus, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id., 691. "It is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings." Id., 693. Rather, a successful petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Copas v.Commissioner, 234 Conn. 139 (1995). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, supra466 U.S. 694. "`When a [petitioner] challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" Fair v.Warden, 211 Conn. 398, 408 (1989); Jeffrey v. Commissioner,36 Conn. App. 216 (1994).
At the time he undertook to represent the petitioner, Attorney Yamin had been in practice approximately seventeen years. Criminal defense represented about of thirty percent of his effort, calculated by income. By the time of his representation of the petitioner, Attorney Yamin had tried several criminal cases to verdict. He had handled two to three felony murder cases, though just one to verdict.
The petitioner asserts that Attorney Yamin's pretrial investigation was inadequate. At the habeas hearing, Attorney Yamin indicated that his first line of inquiry was with the petitioner. He also indicated that often a cooperative client's statements to defense counsel will lead to beneficial avenues for further exploration. In this case, Attorney Yamin indicated, the petitioner was CT Page 2974 essentially uncooperative with him. Attorney Yamin indicated that the petitioner appeared to be distrustful of the system, and of him, and that he provided very little useful information to him. The adequacy of counsel's investigation must be measured, in part, by the degree of information and cooperation provided to him by his client.Williams v. Warden, 217 Conn. 419 (1991)
Attorney Yamin testified credibly that he met several times with the petitioner prior to his trial. He also stated that Quintana said little to him except for his claim that he had been attacked first. Attorney Yamin commented that the petitioner was perhaps the most difficult criminal defendant he had ever represented because of his unwillingness to speak with him, and to assist him in his own defense.[2] Attorney Yamin indicated that Quintana did admit to him that he had been involved in the stabbing, though he neither denied or acknowledged that he had been attempting to rob the victim. Attorney Yamin testified that he learned the details of Quintana's claim that the victim had accosted him with a sharp object from his conversation with Quintana's girlfriend, Berman, with whom Quintana had spoken shortly after the stabbing.
Prior to trial, Attorney Yamin also spoke with Berman, and with counsel for Blas Oliveras. He also reviewed the State's Attorney's file, which had been made available to him as part of the State's open file policy. With respect to certain witnesses whose statements were given to the police, or about whom statements were made to the police, Attorney Yamin indicated that he did not attempt to contact these individuals because their purported observations regarding the criminal occurrence were inconsistent with the statement made to him by Quintana. Thus, he concluded, the observations of individuals, though facially favorable to the defense, were obviously inaccurate, and therefore of no practical use to the defense. Attorney Yamin further reasoned that the pursuit of witnesses who may have misidentified individuals fleeing from the crime scene was not consistent with the defense theory of the case. In essence, Attorney Yamin indicated, Quintana's unstated defense was that he acted in self-defense once in a fight with the victim. This approach, Attorney Yamin reasoned, was not consistent with raising the issue that someone else may have stabbed the victim. Attorney Yamin testified that CT Page 2975 the notion of self-defense, though not specifically available as an affirmative defense at trial, was at the heart of the petitioner's claim to him that the victim had first accosted him, and that he had not been attempting to rob him.[3] His strategy in the case was to raise the specter of self-defense through cross examination of witnesses as a vehicle to create reasonable doubt that Quintana was, in fact, attempting to rob the victim when he stabbed him.
The petitioner further claims that exploration of the observations of these witnesses with the State's Attorney, even if facially mistaken, could have improved counsel's pretrial bargaining position by elevating the State's concern that this inconsistent testimony could provide a basis for reasonable doubt. The short answer to this claim is Attorney Yamin's testimony that the State had offered a plea negotiation to Quintana for a sentence of twenty-five years. Given his exposure on the charge of felony murder, this offer by the State was a considerable concession. The petitioner, however, took the unrealistic position, against his attorney's advice, that he would only agree to a sentence of six years.
With respect to the petitioner's claim that he had been wounded during the altercation with the victim, Attorney Yamin testified that he had no recollection of any claim by Quintana that he had been wounded; nor did he have any recollection of seeing any wounds on Quintana.[4] Attorney Yamin also testified that when he took over this file in May, he was given no such information by the public defender who had represented Quintana from the outset.
At the habeas hearing, Quintana testified that his hand and shoulder had been cut by the victim during the altercation. Indeed, the petitioner showed the court a scar on his left shoulder. He stated also that the Waterbury police were aware of these injuries when he was arrested and that they had, in fact, taken photographs of the cut on his hand. The court does not credit this testimony as trustworthy. While the court observed the petitioner's shoulder wound, there is nothing about this wound which leads the court to any conclusion concerning when or how it was sustained during the petitioner's life time. With respect to the claim that the Waterbury police actually observed a cut on the petitioner's hand, the court believes CT Page 2976 that if that claim were true, there would have been no reason for the police not to have disclosed these pictures as further evidence of Quintana's involvement with the victim. To credit the petitioner's claim that the police actually observed a cut on his hands would lead to a finding that the police took and then discarded photographs of this alleged cut, and failed to make any mention of it in any of the department's investigative reports. Also, the court notes that individuals who would have been in the best position to detect any injuries to the petitioner such as his then girlfriend or family members with whom he was then living were not proffered as witnesses at the criminal trial or habeas hearing in support of this assertion. Finally, the court notes with interest the "Inmate Medical Screening Form" which was completed by the Department of Corrections upon Quintana's pretrial incarceration on March 18, 1986. cf. Respondent's Exhibit 12-E. This form includes the following questions, both of which were answered in the negative: "Does the new inmate have obvious pain or bleeding or other symptoms suggesting need for Emergency Service?," and "Are there visible signs of trauma or illness requiring immediate Emergency or Doctor's care?" This form was signed by both the staff member making the visual observation and Quintana. It belies his claim that at the time he was then suffering from a recurrently bleeding shoulder wound or cuts to his hand. There is no factual basis to support the petitioner's claim that he sustained any wounds in the "altercation" with the victim. The claim lacks proof.
The petitioner asserts that Attorney Yamin failed adequately to cross examine State's witnesses. Specifically, the petitioner alleges that counsel failed to object to testimony by Waterbury Police Officer Stephen Flaherty that Quintana had a previous criminal record. The short answer to this claim is that Officer Flaherty did not state that Quintana had a prior record. Though there was some testimony from Flaherty concerning the numbering of a photograph of Quintana from which one might arguably infer that Flaherty was saying Quintana had been previously arrested, this comment was not directly suggestive of a prior record. Attorney Yamin testified at the habeas hearing that he did not view the comment as relating to a prior arrest. He also stated that, as a matter of trial tactic, he thought it wise to leave the comment alone CT Page 2977 instead of calling attention to the issue of any prior criminal record. The court finds no fault with counsel's decision made in the heat of trial. The court's reading of the trial transcript finds no support for the petitioner's claim that Attorney Yamin dealt inappropriately with Flaherty's testimony.
The petitioner claims also that Attorney Yamin's pretrial investigation and cross examination of Gregorio Hernandez at trial were inadequate. Attorney Yamin testified that while he did not make a discrete investigation of Hernandez prior to the trial, he did, in fact, obtain information about Hernandez before the trial from another attorney, and he was aware of the names of individuals who could offer testimony about him. At trial, Attorney Yamin called one of these individuals, Darren Cook, but out of the presence of the jury, Cook declined to testify on the basis of his right not to incriminate himself.
Hernandez had testified at the probable cause hearing, and he had given a written statement to the police. Both the transcript of the probable cause hearing and the Hernandez statement were available to counsel prior to his trial testimony. Reasonably diligent counsel, alerted to the content of Hernandez' likely testimony before the trial, would have investigated this witness to an extent greater than Attorney Yamin's cursory view in an effort to uncover information of potential use on cross examination. The petitioner has failed to prove, however, that such an investigation would have uncovered any more than it was already the State's obligation to voluntarily disclose to counsel. While information concerning pending criminal cases may have been generally available at the clerk's office as indicated at the habeas hearing, Attorney Yamin had the right to rely on the State's adherence to the Practice Book and to the dictates of decisional law to disclose this information. cf. Brady v Maryland, 373 U.S. 83
(1963).
The most crucial information concerning the pendency of criminal charges against Hernandez, and his receipt of payment from the police before trial, was withheld from the defense. Attorney Yamin was not responsible for the nondisclosure of this exculpatory information. CT Page 2978
Attorney Yamin testified that he was unaware, prior to trial, that Hernandez then had criminal charges pending against him; nor was he aware of Hernandez' involvement with Crimestoppers. Attorney Yamin testified that if he had been made aware of this information he would have used it on cross examination to attack Hernandez' credibility. Given the information reasonably available to him, Attorney Yamin's examination of Hernandez was adequate. He attempted to discredit Hernandez' trial testimony that his statement had not been coerced by the police by bringing out an inconsistency in his probable cause testimony. Attorney Yamin confronted Hernandez with his prior testimony that when initially questioned by the police, the police told him that if he did not cooperate they might consider him to be one of the assailants.
Having examined the trial transcript, and mindful of the testimony of the habeas witnesses, the court concludes that Attorney Yamin's conduct during trial was adequate. His cross examinations were focused; his questioning was targeted to areas of opportunity. That counsel's trial advocacy was unsuccessful is a function of the strength of the State's case and not of counsel's inadequacy to the task.
With respect to counsel's pretrial investigation, while his activities were limited, in part, by the failure of the petitioner to communicate more freely with him, reasonable preparation should have included independent efforts to speak directly with witnesses whose statements identified other individuals as running from the scene, with Jeannette Berman, and with members of the Quintana family who may have provided counsel more insight into the petitioner's state of mind. With the exception of information relating to Gregorio Hernandez, the petitioner has failed, however, to offer any credible proof that further explorations by counsel would, in fact, have produced any evidence useful to the defense. And, as discussed infra, counsel had the right to rely on adherence by the State to rules of discovery entwined in the petitioner's right to due process. The petitioner was not denied the effective assistance of counsel at trial.
GREGORIO HERNANDEZ
CT Page 2979
In order to discuss the petitioner's claims regarding Gregorio Hernandez, it is appropriate to discuss certain facts concerning the relationship between Gregorio Hernandez and the Waterbury Police Department and the relationship between Crimestoppers and the Police Department. Waterbury Police Captain Robert Segal testified to the following in regard to Crimestoppers:
Crimestoppers is an international organization which serves as an umbrella to local affiliates worldwide.
Crimestoppers in Waterbury is a non stock corporation affiliated with the international organization. The Waterbury group was incorporated in the State of Connecticut in 1982 and is supported by local fund raising. It is a civic organization with a civilian board of directors, and exists for the purpose of assisting the local police department solve crimes. The Board of Directors meets monthly.
Crimestoppers has a telephone number which rings on a telephone located at the Waterbury Police Department and manned by a police officer assigned by the Department to be the Crimestoppers officer. This is a separate phone number, not connected to the central police switchboard. Through local advertisements, citizens are encouraged to call the Crimestopper phone number to give information about unsolved crimes. It is the Crimestopper protocol that when a person calls, he or she is given a code number by the Crimestopper officer, and is told to call back at a later date to determine whether the information has led to an arrest. It is Crimestopper policy that if information leads to an arrest, then the caller is provided a reward.
In addition to the Crimestopper officer, there is another police officer who is assigned Crimestopper duties. This is the Crimestopper liaison officer, who is presently a captain in the detective division. After acquiring information from the Crimestopper officer, the Crimestopper liaison officer meets with the Crimestopper Board of Directors at its monthly meeting to report on whether phone calls have resulted in arrests. In those cases, the Board votes to award the callers rewards, the amount of which are often dependent on the seriousness of the crimes. By CT Page 2980 informal understanding, at the time of the Chrisman stabbing, information leading to an arrest for murder usually warranted a reward of one thousand ($1000) dollars. It is the normal procedure for Crimestoppers that once the Board authorizes a reward, the President of the Board writes a check to cash and gives it to the Crimestopper liaison officer who cashes the check and brings it to a drop-off point where it is then retrieved by the person who initially supplied the information to Crimestoppers.
In Waterbury, the municipality supports Crimestoppers by providing funding for the Crimestopper officer's salary, office, and telephone. The officers designated as the Crimestopper officer and Crimestopper liaison officer are regular members of the Waterbury Police Department assigned their duties by the Superintendent of Police. Their actions in regard to Crimestoppers are within the scope of their duties as police officers.
Once the Crimestopper officer receives a phone call and assigns the caller a code number, the officer completes a Crimestopper form which includes a summary of the proffered information. While the original of this form is kept in the Crimestopper officer's office in a filing cabinet for which only he has the key, a copy is sent to the relevant division of the Police Department for action. Though the form is kept in the Police Department building proper, it is not made a part of the Police Department's official file. The form which is sent to a division, e.g. detective division, may be discarded by the division or returned to the Crimestopper officer. Because it is generated by the Crimestopper officer in furtherance of the purposes of Crimestoppers, the rest of the Department does not consider it to be a police document. Thus, when the police file is turned over to the State's Attorney, Crimestopper documents are not included. A copy of this form is not provided to the local Crimestopper organization.
Current Waterbury Crimestoppers President Francisco DiGiovanna testified that he has been a member of the Crimestoppers' Board since its inception in 1982. Mr. DiGiovanna testified that the Board must approve any reward requests at its monthly meeting. Before this meeting, Mr. DiGiovanna reported, the liaison officer meets with a committee of the Board to report calls made to the CT Page 2981 Crimestopper office. During this committee meeting, the liaison officer discusses the date of occurrence, the information provided, and the results led to by the information. Based on this report, the Committee determines to make a specific recommendation to the full Board for reward payment. Once the Board approves payment of a reward sum, the actual payment is totally dependant on the initial informant calling back to retrieve his or her reward. For this purpose, Crimestoppers keeps an escrow amount at a designated drop off point. From time to time there may be four to five hundred dollars available at the drop off point.
Mr. DiGiovanna testified that, in spite of his search for records, he could find no Crimestopper documents or Board minutes relating to any payments made in connection with the Chrisman murder.
While the foregoing is a general recitation of normal Crimestopper procedure, the intake protocol described by Captain Segal, and the normal Crimestopper Board response to reward requests as described by Mr. DiGiovanna do not accurately describe what actually took place in this instance.
Crimestopper records reveal that in the Chrisman murder there was just one person who provided information, and this person was given the code number #368. Crimestopper records support the court's conclusion that this information was not brought to the attention of the Crimestopper officer by an outside phone call. Rather, this information was transmitted to the Crimestopper officer by a member of the Waterbury Police Department following questioning by the police of Gregorio Hernandez.
Waterbury Police Officer Philip Franco testified that he has been on the police force for twenty eight years. He has been assigned to the Crimestoppers office since 1982.
Officer Franco testified that in the Chrisman murder case, there was a Crimestopper report prepared, but he only completed the portion of it stating the names of the individuals arrested and the reward information.[5] Officer Franco stated that the reward information he posted was provided to him by his (then) supervisor. He stated that he CT Page 2982 did not complete the first eight lines of the form nor its narrative portion. He claimed that the narrative portion was completed by Officer David Shuginis. In reviewing this form, the court notes that it indicates that a Murder occurred on March 11, 1986, and that a call was received on March 17, 1986. The caller was given caller code #368. Quintana and Oliveras were identified as suspects. The form indicates that the information was referred to the detective bureau and next to the typed word reward is written "Yes." The form also contains the notation that Quintana and Oliveras were arrested on March 18, 1986 and charged with Felony Murder.
Under the portion of the form dealing with reward is typed the word "reward" next to which is written "$1000.00" and next to the typed words "date paid" is written "3/19/86". Next to the typed word "by" is written "Frank Bochicchio" and next to the typed word "location" is written "Chief Insp. Det. Bur". Officer Franco testified that this notation means that payment was made at the Chief Inspector's office in the Detective Bureau. Finally, with respect to the reward section of the form is the handwriting, "$200" written above the typed words "date paid" and the following written next to an asterisk: "10/8/86-$800 Back to Crime Stoppers (from Det. Bur to Cap. Boyce) $800.00 paid 6/15/87 1300 Quality Auto Sales". cf. Petitioner's Exhibit U. While Officer Franco testified that he has no present recollection of how payments were made in this matter, he commented that Exhibit U is the only form he has ever seen where it appears that payments were made to the same code numbered informant on two different occasions.
John Griffin, Acting Superintendent of the Waterbury Police Department, testified that in 1986 he was the Chief Inspector of the Detective Bureau. Superintendent Griffin stated that he had no dealings with Crimestoppers in 1986, and he indicated that he had never seen Petitioner's Exhibit U prior to the habeas hearing.
Deputy Superintendent David Shuginis testified that in 1986 he was the Crimestopper liaison officer. Deputy Shuginis stated that he prepared a typed written message to be read on the radio concerning the Chrisman murder. The message was introduced as Petitioner's Exhibit V. On the top page of this document is handwritten the following: CT Page 2983 "Case solved see Code #568 #86-06793 3/1/86 March 1986". At the bottom of the page is written "Case solved See Code #368 #86-06793 3/17/86". From testimony of Waterbury police officers, the court notes that the numbers "#86-06793" refer to the Waterbury police investigation number relating to the Chrisman murder, and the notation "#368" is the Crimestopper informant code number for the person who provided information concerning this case. Deputy Shuginis testified to his belief that the handwritten portion of this document was written by Officer Franco. With respect to Petitioner's Exhibit U, Deputy Shuginis stated that while he wrote some of the information on the form, including the narrative portion, he did not write any of the reward information. The narrative portion reads as follows:
 "On 3/19/86 Chief of Det Bur notified crime stoppers that above caller #368 had contacted Det Bur on 3/17/86 and provided essential information, which was corroborated, providing the identity of murder suspects and enabling them to obtain and subsequently serve arrest warrants for two persons. In lieu of this and the additional fact that caller would waive any right to anonymity and will be testifying in this matter — that caller should be entitled to the reward offered by Crime of Week segment (Crime Stoppers) This request was subsequently presented to Chairman of Crime stopper Board for his approval or denial." Petitioner's Exhibit U.
With respect to where he obtained this information, Deputy Shuginis testified that on March 19, 1986, (then) Chief Inspector Griffin had notified him that this caller had contacted the Detective Bureau and had provided this information which the police had corroborated. During this conversation, Griffin gave Shuginis the number #368.
Deputy Shuginis also testified that during this time no one but he and Officer Franco operated the telephone over which callers reported information about crimes. He stated that he did not receive any outside calls on this matter. Similarly, Officer Franco had no recollection of having received any outside calls on the Chrisman murder. He stated that he filled in the portion of the report he CT Page 2984 completed from information he received from his then supervisor Captain Boyce. Thus, neither of the two individuals responsible for answering the Crimestopper phone at the time received any calls from an outside informant concerning the circumstances of the Chrisman murder.
Gregorio Hernandez testified at the habeas hearing. Notwithstanding his prior testimony at the probable cause hearing for Quintana, and his trial testimony at the Quintana and Oliveras trials, Hernandez now says that his statements were the untruthful product of police coercion. Hernandez testified that he was brought to the Waterbury Police Station for questioning in March, 1986 when the police told him that if he did not give a statement they would implicate him in Chrisman's death. He stated that he identified a cigarette lighter and case as the petitioner's only after the police told him the articles belonged to Quintana. In a grand reversal of his prior testimony, Hernandez now claims that he, in fact, knew nothing of the Chrisman murder, and his statement contains only facts told to him by the police. Finally, with respect to payment of reward money, Hernandez testified that the police offered him money for his cooperation. He stated that he received the sum of two hundred ($200) dollars prior to Quintana's trial, and the further sum of eight hundred ($800) dollars after the Oliveras trial. He claimed that he was aware that he would only receive the second installment of money if he testified at Quintana's trial.
The court is mindful that Hernandez testified at the first habeas trial, and that during it, there was some evidence concerning payments to him from Crimestoppers. Given his admitted perjury on at least three occasions, and having had the opportunity to observe Hernandez, the court concludes that his testimony, without corroboration, is untrustworthy. His testimony is not, however, devoid of evidentiary support. A review of the Waterbury Police Department investigative file reveals that on March 17, 1986, Detectives Thomas and Dest spoke with a "young Spanish boy" who told them that Oliveras and Quintana had committed the murder. The report indicates that this "young Spanish boy" told them that he had spoken with Quintana on the evening of March 14, 1986 while in the company of girls, and that in a conversation mostly in Spanish Quintana told him how he and Oliveras had planned to rob a man on Cherry CT Page 2985 Street, that the man began to fight back, that Quintana told him they beat the man, kicked him, punched him and then they each stuck the man with a knife. The report continues that the young man was shown a black cap, a cigarette case and lighter, which he identified as belonging to Oliveras and Quintana. The report concludes with the notation that the young man was brought to the State's Attorney's Office where he was advised of his rights and subsequently gave a written statement in the presence of a stenographer. Petitioner's Exhibit C, Police Investigative File, pp. 14-15. This report contains a copy of a written statement provided to the police on March 17, 1986 at the Office of the State's Attorney by Gregorio Hernandez. The statement was taken by Inspector Joseph Lawlor, Detective James Bart Deeley, and Sergeant Frank Dest. The factual recitation contained in statement is consistent with the probable cause and trial testimony of Hernandez. A review of the police investigative file reveals that this is the only statement taken by the police on March 17, 1986. Indeed, the court finds that the information provided by Hernandez is the information referred to on the Crimestopper report marked as Petitioner's Exhibit U. A reasonable reading of this exhibit, combined with the testimony of Waterbury police officers, leads the court to the conclusion that a reward of $1000 was authorized by Crimestoppers in this matter and made available to members of the Waterbury Detective Bureau on March 19, 1986. The court finds also that on March 19, 1986, the sum of two hundred ($200) dollars was paid to Gregorio Hernandez, on October 18, 1986 the balance of eight hundred ($800) dollars was returned to Crimestoppers, and on June 16, 1987, the sum of eight hundred ($800) dollars was paid to Hernandez at Quality Auto Sales, a drop off point used by Crimestoppers and the Waterbury Police Department. This conclusion is based on the evidence of the timing, content, and location of the Hernandez statement, and its identity to the outline recited in Petitioner's Exhibit U, combined with the stipulation by the parties — supported by the evidence — that the only reward paid by Crimestoppers in the Chrisman murder was paid to the informant whose code number was #368.[6] The testimony by Hernandez that he never called Crimestoppers is consistent with evidence that neither Franco nor Shuginis received an outside call from an informant on this matter. It is a clear inference that Crimestoppers was contacted by unknown members of the Waterbury Police Department who received the sum of one CT Page 2986 thousand ($1000) dollars from Crimestoppers and paid it in two installments to Hernandez. This inference is further supported by the testimony of Deputy Shuginis who stated, on reviewing Petitioner's Exhibit U, that the handwriting "Frank Bochicchio" refers to the (then) second in command of the Detective Bureau, and the typed word "by" written before Mr. Bochicchio's name refers to the name of the person who made the payment. Additionally, Deputy Shuginis stated that the term "Location" refers to the physical location where payment of the reward is made. Thus, Deputy Shuginis reads the form to state that on March 19, 1986, the sum of two hundred ($200) dollars was given to Frank Bochicchio who then gave it to an informant at the Detective Bureau.[7]
Deputy Shuginis stated his belief that the reference on the form to June 16, 1987 means that the sum of eight hundred ($800) dollars was paid on that date at Quality Auto Sales, a business location of one of Crimestoppers' Board members. Finally, Deputy Shuginis testified that during the time he was involved with Crimestoppers he had no knowledge of a split payment being made. Acknowledging that Petitioner's Exhibit U would appear to reflect a split payment, Deputy Shuginis stated he has no knowledge of why it occurred in this case. Finally, the court notes the testimony of Deputy Shuginis that he has a vague recollection there were times the police could call the Chairman of the Crimestoppers Board, explain an aberrant situation to him, and money could be authorized without prior board approval.
From this evidence, the court concludes that Gregorio Hernandez was the person designated as #368, and that he received a payment of two hundred ($200) dollars from the Waterbury Police Department on March 19, 1986, and a further payment of eight hundred ($800) dollars on June 16, 1987.[8]
The legal question created by this factual finding is whether the State was obligated to inform the defense that Hernandez had been paid, and, if so, whether the State's nondisclosure entitles the petitioner to a new trial. The petitioner frames two constitutional arguments. First, he claims that the State's nondisclosure violated his right to confrontation. This claim is legally flawed. "The right of an accused to confront witnesses against him is guaranteed by the confrontation clause of both the federal and state constitutions. U.S. Constitution, Amendments VI,XIV, Connecticut Constitution, Article I, Section 8." State.CT Page 2987v. Marquis, 241 Conn. 823, 837 (1997). The Appellate Court has opined that a primary interest secured by thesixth amendment's confrontation clause is the right of cross examination. State v. Cooke, 42 Conn. App. 790 (1996). "In order to comport with the constitutional standards embodied in the confrontation clause, the trial court must allow a defendant to expose to the jury facts from which the jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." State v. Beliveau, 237 Conn. 576 (1996). "The confrontation clause requires that `[if] the testimony of such a witness is to remain in the case as a basis for conviction, the defendant must be afforded a reasonable opportunity to discover any infirmities that may cast serious doubt upon its truthfulness.'" State v. Morant,242 Conn. 666 (1997). "`The sixth amendment to the United States constitution confers upon a defendant the right to be confronted with the witnesses against him. A significant aspect of the right of confrontation is the cross examination of adverse witnesses to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the [witnesses]. Because the core value protected by the confrontation clause is the enhancement of the truth-seeking process, [c]ross examination to elicit facts tending to show motive, interest, bias and prejudice is a matter of right and may not be unduly restricted.'" (Internal citations omitted) State v. Monteeth,208 Conn. 202, 209 (1988). Thus, if the court had sustained objections to any defense questions regarding payment of funds to Hernandez by the State, the defendant would have, in this court's view, been denied his right to confrontation.
In this case, however, the petitioner makes no claim that the court unduly restricted his cross examination of Hernandez. In essence, it is his claim that the State's nondisclosure of information about Hernandez denied him the right to effective cross examination. Such an assertion does not implicate the confrontation clause of either the State or Federal constitution. "The confrontation clause is implicated only `when there [is] a specific statutory or court-imposed restriction at trial on the scope of questioning.'" State v. Harris, 227 Conn. 752 (1993). In the absence of proof that the court unduly restricted CT Page 2988 counsel's cross examination, this claim, rooted in the confrontation clause, must fail.[9]
The petitioner also claims that the failure of the State to disclose a reward payment to Hernandez violated the terms of Brady v. Maryland, 373 U.S. 83 (1963), C.G.S. 5486c, and Practice Book 741. While the court finds that information that Hernandez had been paid funds by the police should have been disclosed, the State's nondisclosure did not violate the Bagley materiality test. Pursuant to Brady, a prosecutor is under a duty to disclose to a defendant any evidence he possesses that is both favorable to the accused and material to guilt or punishment. State v. John,210 Conn. 652 (1989). In order to establish a Brady violation, the petitioner must demonstrate that the prosecution had possession of information favorable to him. State v.Crumble, 24 Conn. App. 57 (1991). In order to prove possession by the State, the petitioner need not demonstrate that the State's Attorney himself, or even the prosecution team, was in possession of Brady material. Possession of such material by the police, even if unknown by the State's Attorney, as in this case, will be imputed to the State's Attorney. "The State's duty of disclosure is imposed not only upon its prosecutor but also on the State as a whole including its investigative agencies. Therefore, if the [exculpatory material] were held by the . . . police department we would be compelled to conclude that, constructively, the State's Attorney had both access to and control over the documents. . . . (Internal citations omitted)." Demers v. State, 209 Conn. 143, 153 (1988).
In this case, Attorney Yamin, by motion dated May 7, 1986, requested all exculpatory information and material from the State. Petitioner's Exhibit G. Information that Hernandez had been paid funds by members of the Waterbury Police Department was within the possession and control of the Police Department.[10]
In order to demonstrate a Brady violation the petitioner must show not only that the information was in the possession of the State, but that it was favorable to the defense, and that it was material. State v. Milner,206 Conn. 512 (1988). Information that Hernandez was paid by the police shortly after he gave his written statement was favorable to the defense. "Impeachment evidence as well as CT Page 2989 exculpatory evidence falls within Brady's definition of evidence favorable to an accused." State v. Monteeth, supra,208 Conn. 213 (1988).
The test for materiality of Brady material was set forth by the United States Supreme Court in United States v.Bagley, 473 U.S. 667 (1985). According to Bagley, as applied in Connecticut, the test of materiality of nondisclosed exculpatory evidence requires that there be a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." (Internal citations omitted). State v. McIntyre,242 Conn. 318 (1977). Here, the petitioner's claim falters. While evidence that Hernandez had been paid may have given defense counsel ammunition to demonstrate that Hernandez was a disloyal opportunist, the court is unpersuaded that such evidence would have eroded the fact finders' confidence in the veracity of his testimony.
Much of the Berman and Hernandez testimony was consistent. From both, the jury heard that Quintana had, in fact, admitted that he stabbed the victim to death on the evening of March 11, 1986 on Cherry Street. Both testified that Quintana told them he had seen the victim enter a grocery store, he had stood outside the store while the victim was inside, and the stabbing took place after the victim had exited from the store. The jury also heard from both Berman and Hernandez that Hernandez had been picked up in a car a few days after the stabbing with Berman, another girl, and Quintana present, and that while in the back seat of the car, Hernandez and Quintana conversed in Spanish. Both Berman and Hernandez identified Quintana's cigarette lighter and case found at the crime scene as belonging to him.
The Berman and Hernandez recitations varied only in regard to the accounts they claimed Quintana gave them of the dynamics of the stabbing itself. Here, the physical evidence is inconsistent with the account recited by Berman and consistent with the account narrated by Hernandez. Quintana's claim to Berman that the victim had stabbed him, or struck him with an object so as to cut his hand and wound his shoulder, finds no corroboration in the physical CT Page 2990 evidence located at the crime scene, or on his body. Nowhere was there any evidence that a knife or other sharp object was found on or nearby the victim. The petitioner offered no credible evidence that he sustained any defensive wounds during the altercation. Also, forensic evidence of abrasions to the face and body of the victim in addition to his stab wounds is consistent with Hernandez' testimony that Quintana told him that he and Oliveras beat the victim before stabbing him. Evidence that Quintana waited outside the store while the victim was inside was "lying in wait" evidence that the jury could reasonably consider as an element of attempted robbery.
Thus, the consistencies in the Berman and Hernandez recitations together with the fact that the physical evidence does not support Quintana's self-defense or defensive wound claims, provides extrinsic corroboration of Hernandez' testimony. The court is unpersuaded that even if the State had fulfilled its duty to provide the exculpatory evidence of Hernandez's receipt of funds, and the pending criminal charges, that a reasonable fact finder would have found reasonable doubt of Quintana's guilt.[11] Fact finders, in assessing the credibility of a witness, are entitled not only to focus on the persona of the witness but on whether external objective physical evidence and the testimony of other witnesses corroborates or diminishes the vitality of the proffer. In this case, reasonable inferences to be made from the physical evidence and the balance of the trial evidence amply supported the jury's verdict. While the information should have been disclosed, the State's failure to provide this information does not undermine the reliability of the verdict.
The petitioner's last count contains an assertion that the petitioner is factually innocent. The foundation of this claim is the recantation by Hernandez of his trial testimony. Hernandez is not a credible witness. His recantation is but an illustration of his wavering disloyalty to the truth. The factual innocence claim lacks merit.
For the reasons stated, the petition is dismissed.
Bishop, J. CT Page 2991