******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

D'AURIA, J., concurring in part and dissenting in part. When a court is presented with a case posing a unique set of facts amid a legal landscape that is not well developed, often, the most prudent course is to opt for a practical solution. This is such a case. And while I accept my share of responsibility for the delay in deciding this case, the most practical solution has always been right in front of us: remand the case to the trial court to order an official translation of the complainant's journals from Spanish to English. This simple step is appropriate under our rules of practice, is supported by our own case law and case law from other courts, and would resolve an unusual dilemma sooner than awaiting a collateral proceeding, serving the interests of the complainant, the parties, and the judicial system. I do not understand the majority's resistance to this commonsense solution, and I therefore respectfully dissent as to part II of the majority opinion. I concur with part I of the majority opinion except for footnote 10, with which I disagree and which, in my view, is not necessary to the opinion.

I

Prosecutors in the present case encountered a situation that challenged their conventional obligations to disclose to the defendant, Andres C., any exculpatory or impeachment evidence in their exclusive possession. See generally *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). The complainant, the state's main witness, revealed for the first time during her redirect testimony that, at her therapist's suggestion, she had kept journals that documented some of the defendant's alleged abuse of her. That these journals promptly came into the state's possession, which the state does not dispute, meant it had a duty to review them to determine if they contained *Brady* material. See, e.g., *Strickler* v. *Greene*, 527 U.S. 263, 278, 119 S.

Ct. 1936, 144 L. Ed. 2d 286 (1999) (pursuant to *Brady*, state must "disclose to the defense all exculpatory evidence known to it—or in its possession" (internal quotation marks omitted)); *Peeler* v. *Commissioner of Correction*, 170 Conn. App. 654, 700, 155 A.3d 772 ("*Brady* requires the state to disclose all evidence in its exclusive possession that is favorable to the defendant and material. . . . *Brady* does not require the state to obtain and disclose evidence in the exclusive possession of a private, third party entity." (Citation omitted.)), cert. denied, 325 Conn. 901, 157 A.3d 1146 (2017).

As prosecutors sought to comply with their affirmative constitutional obligation under *Brady*, at least two problems confronted them. First, although *Brady* claims most often involve either pretrial or posttrial skirmishes over potentially exculpatory evidence, these journals came to light during the complainant's testimony on the first day of trial. See *United States* v. *Agurs*, 427 U.S. 97, 103–107, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (enumerating three circumstances in which *Brady* claims often arise, all occurring either before or after trial). Although the parties were trying the case to the court and not a jury, presumably, the court planned for the case to proceed apace. Second, the victim recorded her journals in Spanish, and the record does not reflect that any of the other participants in this trial spoke Spanish, or spoke it well enough to translate the journals in a way that would be useful to the state, the defendant, or the court.[1]

---

[1] Another challenge to any review or use of the journals is that the complainant's testimony suggested both that her journals were the "best record" of her allegations of the defendant's abuse and also that, at her therapist's request, she sometimes used these journals for therapeutic exercises that were hypothetical in nature. Therefore, she did not claim that the journals were necessarily in all instances accurate accounts of the abuse. For example, she testified: "[My therapist] would have me write a lot about either my relationship to [the defendant], with [the defendant], how the abuse happened. I would reflect a lot on how it made me feel, how I was missing, why I didn't want to talk. Sometimes in the journal, we'd write about—like

Both the majority and the dissent detail sufficiently the procedure trial prosecutors undertook to have the complainant's journals reviewed by an investigator in their office (reported to be bilingual), the limited disclosure made to defense counsel from the journals after that review, and the defendant's claim concerning those journals on which the parties are at issue on appeal. I will not repeat how that issue has arrived before us. The majority concludes that "the prosecutor did not violate *Brady* by not personally reviewing the journals" but, instead, delegating[2] that review to a subordinate. This conclusion leads the majority to reject the defendant's calls to adopt a prophylactic rule requiring prosecutors to personally review records that come to light during trial for *Brady* material and to hold that this

if I was having family fights, so my journals are the abuse that I lived with him, but also family fights with my siblings and my mom." The complainant also agreed with defense counsel when he asked her on cross-examination if the journals were her "words through therapy . . . ."

[2] The majority eschews use of the word "delegate." I do not understand its aversion to the word. I use the word "delegate" for two reasons. First, it is the word both the Appellate Court and the state use. Second, the euphemisms used to describe the prosecutors' assignment of the chore of translating the journals to the investigator fail because they are inaccurate. Specifically, the prosecutors did not "enlist the assistance of a Spanish-speaking investigator on her staff to *help* review the journals." (Emphasis added.) Nor did the prosecutors enlist the investigator "to *assist in the review of records* for potential *Brady* material." (Emphasis added.) The investigator reviewed the journals. Period. The prosecutors did not. Indeed, on this record, as between the prosecutors and the investigator, the latter was the only one who *could* have reviewed them because they were written in Spanish. The majority's use of the passive voice does not help either. That is, the prosecutors did not "seek assistance" "when [the] material is reviewed to identify discoverable *Brady* information." These phrases connote that the prosecutors undertook some review of the journals, with the investigator assisting in that review. If, for whatever reason, we are to resist using the word "delegate," the more accurate description, supported by the record, is the use of a different preposition, namely, the investigator provided assistance to the prosecutors in meeting their *Brady* obligation *by* reviewing the journal. Use of this phrase would be unnecessarily confusing, however, because, although it is more accurate, I do not see how this is not the definition of "delegating" review of the journals.

fact bound determination of whether the prosecutors complied with *Brady* is to be determined on a case-by-case basis. The dissent would conclude, to the contrary, that "it is clear that the constitutional requirements of *Brady* have not been satisfied." The dissent would therefore remand the case to the trial court to have the journals translated into English and have the trial court review them in camera for *Brady* material.

My review of the authority contained in these competing opinions leaves me without confidence that there is a clear federal constitutional rule addressing this situation. Very little case law exists concerning the extent to which prosecutors may delegate the review of evidence as part of their affirmative constitutional duty under *Brady*. See *Kyles* v. *Whitley*, 514 U.S. 419, 432, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) ("[t]he prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early [twentieth] century strictures against misrepresentation and is of course most prominently associated with this [c]ourt's decision in *Brady*" (citation omitted)). The case law that does exist does not, in my view, sufficiently yield a federal rule.[3] In fact, if the defendant had brought a claim of error based on the state constitution—and clearly he has not—I believe our case law would require that we decide the state constitutional question first. See, e.g., *State* v. *Kono*, 324 Conn. 80,

---

[3] Like the dissent, I believe that the majority overstates the significance of the case law it relies on, citing no federal cases above the federal court of appeals level and no cases outside of the personnel files context. See *United States* v. *Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992); *United States* v. *Smith*, 552 F.2d 257, 262 (8th Cir. 1977); *Stacy* v. *State*, 500 P.3d 1023, 1038 (Alaska App. 2021). This case law is sufficiently sparse and distinguishable that I would not glean from it a clear federal rule that courts should review a prosecutor's decision to delegate his or her *Brady* responsibility only on a case-by-case basis. However, because my suggested resolution of the present case does not require me to pass on the "propriety of delegating [*Brady* review] to a nonlawyer," I do not feel compelled to join in raising all the concerns the dissent has raised about that delegation.

123, 152 A.3d 1 (2016) ("if the federal constitution does not clearly and definitively resolve the issue in the defendant's favor, we turn first to the state constitution to ascertain whether its provisions entitle the defendant to relief"). Although we certainly have the authority and responsibility to rule on federal constitutional questions, in the present case, I would do so only after we have exhausted any nonconstitutional basis for resolving the controversy before us. See, e.g., *State* v. *McCahill*, 261 Conn. 492, 501, 811 A.2d 667 (2002) (we "do not engage in addressing constitutional questions unless their resolution is unavoidable"). Fortunately, I believe an obvious basis exists. Unfortunately, the majority chooses not to pursue it.

## II

The majority and the dissent, in their attempts to join issue over what is at stake in this case, have not been able to agree on how to interpret the claim on appeal, including the relief the defendant seeks or the rule he advocates. The dissent concedes that the "defendant's request for a prophylactic rule may have been unnecessary" but concludes that this court has an "inherent authority and obligation" to consider remedies that are more tailored and narrow. Accordingly, the dissent reasons that the defendant's argument for the adoption of a prophylactic rule "does not preclude appellate review of his as applied *Brady* challenge." Responding to both this concurring and dissenting opinion and to the dissent, and notwithstanding that I have quoted verbatim three instances from the defendant's brief describing his position, the majority insists that "[t]he defendant's only claim on appeal is that the prosecutor herself was required to conduct the review."

But that's not accurate. The majority's strict reading of the defendant's claim leaves out a critical predicate to his proposed prophylactic rule before this court.

Specifically, the defendant's "only claim on appeal" is *not* simply "that the prosecutor herself was required to conduct the review." Rather, the defendant argues that "due process require[s] that one or both of the prosecutors should have personally conducted a *posttranslation Brady* review." (Emphasis added; internal quotation marks omitted.) More particularly, the defendant explains that "the prosecutors, who elicited the complainant's direct and redirect testimony, and observed her cross-examination and recross-examination, were in the best position . . . to review the journals (*once translated*) for *Brady* material, and to make reliable 'judgment calls' about what should be disclosed." (Emphasis altered.) And, finally, the defendant argues in his brief: "Reviewing 200 pages of a witness' journal (*once translated*) may seem like a burden or inconvenience to a prosecutor, but when specific materials must be subjected to a *Brady* review, any burdens associated with that duty become irrelevant." (Emphasis added.) The defendant made the same request before the Appellate Court. To the extent the majority contends that "the defendant has not identified on appeal any evidence that was subject to *Brady* that the state failed to disclose," it is impossible for the defendant to make such a claim *without* first obtaining a translation because the journal is in Spanish.

I agree with the dissent that "[n]o principle of law or logic . . . precludes this court from granting more circumscribed relief" than the defendant has requested. I would therefore address the defendant's argument on appeal to the extent that he seeks a rule that the state must secure an official translation, consistent with state judicial standards, of material that might contain exculpatory evidence, such as the complainant's journals. Juxtaposed against the lengths to which the majority goes to explain, and then ignores as irrelevant, the state's articulated position concerning the four pages

it submitted to the trial court from the complainant's journal, the majority's position that the defendant has not sought any "alternative form of relief" in this court, such as ordering a remand for a translation of the journals, strikes me as overly stingy. About the journal excerpts, the majority explains, "[w]hatever the prosecutor's reason may have been for providing the excerpts to the trial court, it is clear that the court understood that it was reviewing them for *Brady* material." As the dissent explains, its reason for raising the issue concerned the *prosecutors'* understanding of what they were submitting the excerpts to the court for (review under the rape shield statute), and not the *trial court's* understanding of what it found itself doing with those documents once they landed on its desk (review under *Brady* notwithstanding the prosecutors' specifically disclaiming an intent to submit for *Brady* review). The majority's reading of the record is supportable, although generous. I do not believe that it would require as much generosity for the majority to view the defendant's appeal as including a claim that we order preparation of an official translation for review by the fact finder for *Brady* material. That is to say, if we can divine what the trial court "understood" it should do with the journal excerpts, despite the state's "confounding" and in fact "mistake[n]" claim about those pages, surely, we can find our way to understanding that the defendant's claim seeks a translation. We should address that claim (and I would order it), even if we do not go so far as to agree with the defendant's claim that we should order the trial prosecutors to undertake a review of that translation personally.

In declining to adopt a prophylactic rule requiring prosecutors to review records personally for *Brady* material, with no ability to delegate responsibility to others, the majority insists that it perceives "no significant risk that, in the absence of such a prophylactic

rule, the constitution will be violated." See, e.g., *State v. Dickson*, 322 Conn. 410, 426 n.11, 141 A.3d 810 (2016) (significant risk of constitutional violation justifies prophylactic rule), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017). I am not prepared to conclude that federal law requires—either prophylactically or as applied to the present case—that, to fulfill their duties under *Brady*, trial prosecutors must review all records personally. However, I do not understand why the majority refuses to require—either prophylactically or as applied to this case—the translation of records that are in another language, like the complainant's journals, before prosecutors can represent to the trial court and the defendant that those records contain no *Brady* material. The majority does not explain why the risk of a constitutional violation is not "significant"—and was not in the present case—when prosecutors are *unable* to review the untranslated records personally for the simple reason that they do not speak the language in which the records are written. The Judicial Branch agrees that the risk of an inaccurate translation is genuine. Sensitive to the innumerable languages and dialects that may present themselves in court proceedings, the Judicial Branch has made interpreter and translation services available. As the dissent details, court-appointed translators for the Judicial Branch must pass written, oral, and ethics examinations, must agree to be bound by the Code of Professional Responsibility for Court Interpreters of the State of Connecticut Judicial Branch, and be sworn by a Superior Court judge. See Interpreter and Translator Services-CT Judicial Branch, available at https://jud.ct.gov/jobs/JobDetails.aspx?j=6329 (last visited June 11, 2024). In no way do I intend to disparage the state's investigator (who was performing an assigned task), or to ignore the midtrial challenge that prosecutors faced when I observe that we are equipped to do better than turning to some-

one who happens to be on staff and speaks Spanish to provide a translation. Nothing in the record indicates that the investigator's credentials qualified her to provide translation services to the court.[4]

[4] Producing an accurate translation is often not an easy feat, as settling on the appropriate meaning for terms can require nuance. These difficulties presented themselves, for example, when defense counsel cross-examined the complainant about the one journal page that the defendant had received, with counsel and the witness stumbling over the Spanish words for "rewrite" versus "describe":

"[Defense Counsel]: And it's in Spanish; is that correct?

"[The Complainant]: Yes.

"[Defense Counsel]: And it says in Spanish, 'describir mi historia de abuso.' Have I read that correctly in Spanish?

"[The Complainant]: No.

"[Defense Counsel]: Could you read it, please?

"[The Complainant]: It says 'reescribir mi historia de abuso.'

"[Defense Counsel]: And what does that mean?

"[The Complainant]: 'Reescribir' means to rewrite  . . . .

"[Defense Counsel]: And what does 'describir' mean?

"[The Complainant]: 'Describir?'

"[Defense Counsel]: Yeah.

"[The Complainant]: Well, 'describir' is to describe.

\* \* \*

"[The Court]: Can I just—well, it's not going to help me, it's in Spanish; so, go ahead. I mean, she—she interpreted it, so it's fine.

"[Defense Counsel]: Did you want to look at it, Your Honor?

"[The Court]: It's not going to help me.  . . .  Unless it says abogado or que pasa, it's not going to be much help.

"[Defense Counsel]: And we can agree that the Latin alphabet is the same alphabet in English as it is in Spanish, correct?

"[The Complainant]: Sure. I don't know that. Maybe.

"[Defense Counsel]: Well—

"[The Complainant]: Like, you mean the letters? A is A?

"[Defense Counsel]: Correct.

"[The Complainant]: Yeah.

"[Defense Counsel]: And that an R in Spanish looks like an R in English, correct?

"[The Complainant]: The R in Spanish looks like an R in English, yes.

"[Defense Counsel]: It's the same letter?

"[The Complainant]: Yes."

Not only is creating a baseline translation complex, but comprehending handwritten documents can create even more challenges in providing a correct translation. This was evident in the prosecutor's redirect examination of the complainant about the same journal page, as the prosecutor tried to determine whether the complainant wrote a certain word incorrectly in her journal entry:

The majority assures us several times—and admonishes the state—that prosecutors bear the "ultimate responsibility" of complying with the state's affirmative *Brady* obligations. But the majority does not explain how the prosecutors in the present case could have possibly carried out this ultimate responsibility when they could not read Spanish and no translation of the journals was provided for their review.[5] Without a translation, the prosecutors effectively relied entirely on the investigator's conclusions of what she recognized as *Brady* material, essentially delegating the state's final disclosure determination.

All that the majority can muster to say is that the record is inadequate to determine whether the state's delegation poses a constitutional problem, although, if

"[The Prosecutor]: . . . [T]his page that you just saw, this was the prompt for which you wrote . . . .

"[The Complainant]: Yes, and it says 'rewrite,' because, if it said 'describe,' it would have less letters in that word. It's not just an accidental R and a D switch.

"[The Prosecutor]: So—

"[The Complainant]: It specifically says 'rewrite,' not 'describe.'

"[The Prosecutor]: Rewrite my history of abuse, correct?

"[The Complainant]: Yes, the way it should have played out."

[5] The majority cites to the United States Department of Justice Manual, which provides in relevant part: "Because the responsibility for compliance with discovery obligations rests with the prosecutor, the prosecutor's decision about how to conduct this review is controlling. This process may involve agents, paralegals, agency counsel, and computerized searches. Although prosecutors may delegate the process and set forth criteria for identifying potentially discoverable information, prosecutors should not delegate the disclosure determination itself. . . ." (Emphasis omitted.) U.S. Dept. of Justice, Justice Manual, tit. 9, 9-5.002 (Step 2), available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5002 (last visited June 11, 2024).

In my view, this manual does not support the majority's position. This guidance draws a line when it comes to the final "disclosure determination itself," maintaining that this responsibility lies with the prosecutor alone. Id. To me, it seems quite clear that the prosecutors in this case *did* abandon the final *Brady* determination. Without a translation, the prosecutors had to fully rely on the investigator's representations, thereby functionally delegating the disclosure determination.

prosecutors were to fall short of their *Brady* obligations, the state could suffer a disciplinary dismissal or the prosecutor could be vulnerable to a professional disciplinary complaint and proceeding.[6] Notwithstanding the prosecutors' "ultimate responsibility" for *Brady* compliance, under circumstances such as these, the possibility that the court might dismiss a prosecution or that trial prosecutors might be disciplined is so remote as to be facetious.[7] And appropriately so. Speaking for myself, I would not support imposing sanctions on the state or on prosecutors for making judgments such as those they had to make midtrial in this case. I am not convinced that the law is so blind to the impossibility of the prosecutors' ultimate compliance with *Brady* in a case such as this, however. Even if we do not adopt a rule requiring that prosecutors review the documents personally for *Brady* material, I have not

---

[6] Regarding a prosecutor's delegation to another person of the task of reviewing materials, such as journals, for compliance with *Brady*, the majority also states that the prosecutor "remains *constitutionally*, professionally and ethically accountable for that individual's performance." (Emphasis added.) I do not understand how a prosecutor is "constitutionally" accountable under these circumstances. The majority just finished concluding that the prosecutors are not constitutionally accountable, despite the lack of translation and their delegation to the investigator.

[7] The majority can only be talking about the most egregious of *Brady* violations when the state might suffer a disciplinary dismissal or a prosecutor might be subject to professional discipline. Recent research reveals that, in 2000 instances of reported prosecutorial misconduct, "prosecutors were disciplined in only [44] cases and were never criminally prosecuted." (Emphasis omitted; internal quotation marks omitted.) B. Murray et al., "Qualifying Prosecutorial Immunity Through *Brady* Claims," 107 Iowa L. Rev. 1107, 1122 n.85 (2022). Nor is potential personal liability a likely deterrent to noncompliance with *Brady* or an incentive for compliance. Prosecutors enjoy broad protections from harm for oversights or misjudgments in a particular case. See, e.g., *Imbler* v. *Pachtman*, 424 U.S. 409, 424–25, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976) (prosecutors have absolute immunity from actions brought pursuant to 42 U.S.C. § 1983 for all of their activities associated with their conduct during litigation because "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages")).

heard a convincing argument for why we would not at least rule that, under these circumstances, either as a prophylactic rule or in this case alone, the state was required to secure an official translation of the journals.

### III

Obtaining a translation of the journals that complies with Judicial Branch standards—even at this stage—is an uncontroversial and commonsense measure that could promptly resolve the issue of whether the journals contain additional exculpatory material while ensuring the protection of the defendant's constitutional rights.[8] Although the majority provides no overt explanation for its opposition to an official translation—either as a prophylactic rule, or as a solution in the present case, it hints at reasons for its resistance.

First, the majority points out that, after the prosecutor spelled out—in chambers and on the record—the procedure she intended to follow to review the journals for *Brady* material, defense counsel agreed on the record that a translation was not necessary. Although the majority describes the defendant as having "acquiesced in the procedure," it does not seriously contend—and develops no argument—that the defendant waived any claim that the state should have secured an official translation of the journals. Defense counsel only agreed with the trial court that the journals did not need to be translated "at this point," hardly a sufficiently unequivocal statement to constitute a waiver of this issue on appeal. This exchange occurred before prosecutors reported the results of the investigator's review to the court and before that report turned out to be lacking. Nor does the majority

---

[8] The trial court marked the journals as an exhibit so that "should an appellate court deem it appropriate to review those journals, they'll have an opportunity to do so." Surely, the judge anticipated that perhaps this court would not be able to review journals written in Spanish and acted under the assumption that we would have the journals translated if we were to review them.

argue that the prosecution's affirmative obligation to disclose exculpatory information in its possession can be waived under these circumstances.[9] See, e.g., *Kyles* v. *Whitley*, supra, 514 U.S. 432–33; *Gomez* v. *Commissioner of Correction*, 336 Conn. 168, 189, 243 A.3d 1163 (2020) ("defendant cannot 'waive the freestanding ethical and constitutional obligation of the prosecutor as a representative of the government to protect the integrity of the court and the criminal justice system' "), quoting *Sivak* v. *Hardison*, 658 F.3d 898, 909 (9th Cir. 2011).

The majority also points out that the defendant could have subpoenaed the complainant's journals or renewed his request that the trial court review the journals in camera for *Brady* material after prosecutors had indicated that the journals contained none. This is the majority's panacea: relief "would not have been necessary if the defense had taken advantage of adequate existing procedures." Not exactly. As a practical matter, subpoenaing the journals or asking the court to review them in camera would have been futile. They were in Spanish. For the journals to be of any use to either defense counsel or the trial court, one of them would have had to secure a translation.[10] The majority

___

[9] In the context of a defendant's attempt to withdraw his guilty plea, the United States Court of Appeals for the Second Circuit has held that a *Brady* claim will survive an otherwise knowing, intelligent, and voluntary guilty plea. See *United States* v. *Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) ("[T]he validity of the plea must be reassessed if it resulted from impermissible conduct by state agents . . . . Impermissible conduct includes *Brady* violations. . . . Thus, we have noted that where prosecutors have withheld favorable material evidence, even a guilty plea that was knowing and intelligent may be vulnerable to challenge." (Citations omitted; internal quotation marks omitted.)).

[10] See footnote 4 of this opinion. In its brief to and at argument before this court, the state has repeatedly acknowledged that it would be appropriate for this court to obtain a translation of the journals and review them if this court finds "there was any error in the procedures employed for reviewing and disclosing [the complainant's] journals." In fact, the state suggests that this court assign not one, but "two Judicial Branch interpreters to produce a sealed English translation of the journals." It is not clear to me how employing the services of two interpreters would work, or whose translation

has not explained why that would be the defendant's obligation. Nor am I aware of any authority that would require the state or the court to accept a translation the defendant secured on his own. In fact, oddly, if the defendant had compelled the production of the journals and had them translated, either for use at trial or for submission to the trial court to review in camera, the prosecutors (the only ones with a duty to review the journals in the first instance for *Brady* material) would be the only ones who had not previously seen the journals, turning the *Brady* process on its head.

IV

At most, the defendant's failure to take advantage of "adequate existing procedures" means his *Brady* claim on appeal is unpreserved. Presumably because of the state's affirmative constitutional obligations under *Brady*, however, "this court has regularly entertained claims of *Brady* violations that were not distinctly raised at trial, as long as those claims satisfied *Golding*." *State* v. *McCoy*, 331 Conn. 561, 598, 206 A.3d 725 (2019); see *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*). See generally *State* v. *Rosa*, 196 Conn. App. 480, 501, 230 A.3d 677 ("Despite our Supreme Court's preference to first have the trial court assess the impact of a *Brady* violation, we do not interpret this stated preference as an inviolable rule that any *Brady* claim must first be fully presented and preserved in the trial court or be deemed waived. That would be a derogation of defendants' rights under *Golding*. This court has reviewed unpreserved *Brady* claims under *Golding* when there was *no dispute as to the nature* of the allegedly suppressed evidence." (Emphasis added.)),

would prevail, but the suggestion itself manifests the state's appreciation of the difficulty and imprecision inherent in translating.

cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020). In fact, when it comes to *Brady* claims, this court has even pressed beyond the dictates of *Golding*'s first prong; see *State* v. *Golding*, supra, 239; at times ordering limited remands to supplement the record so that a reviewing court can determine if the state has complied with its affirmative constitutional obligations under *Brady*.

For example, in *State* v. *Floyd*, 253 Conn. 700, 756 A.2d 799 (2000), following the defendant's conviction, defense counsel received information indicating that one of the state's witnesses had testified pursuant to an undisclosed plea agreement with the state, which it is well established constitutes "impeachment evidence falling within the definition of exculpatory evidence contained in *Brady*." Id., 737. Because this claim came to light postconviction, the record did not contain evidence of the plea agreement for this court to review. See id., 730–31. Invoking our supervisory authority under Practice Book § 60-2, we took the practical step of remanding the case to the trial court for an evidentiary hearing to determine whether a *Brady* violation had occurred. See id., 732. This procedure is now common practice, referred to as a *Floyd* hearing. In *State* v. *Ortiz*, 280 Conn. 686, 911 A.2d 1055 (2006), the state complained that "the *Floyd* hearing procedure is inconsistent with the first prong of *Golding*, which  .  .  . requires the defendant to produce a 'record  .  .  . adequate to review the alleged claim of error'  .  .  . ." (Citation omitted.) Id., 712 n.17. We explained that a *Floyd* hearing "permit[s] the rapid resolution of these fact sensitive constitutional issues and mitigate[s] the effects of the passage of time that would accompany requiring defendants to wait to address these matters until after the conclusion of direct appellate review. Indeed, the potential memory fade attendant to this delay conceivably might even reward the state for violating *Brady*." Id., 714 n.17. We reasoned further that

forcing defendants to develop their *Brady* claims "in collateral attacks via habeas corpus proceedings . . . fosters delay as the proceedings on direct appeal are exhausted prior to the commencement of habeas proceedings, and deprives a trial court already familiar with the matter of the opportunity to address *Brady* claims in a timely fashion." Id.

Thus, regardless of how other courts, including federal courts, might handle late arising *Brady* claims, this court has opted, in the exercise of its supervisory authority, to permit a limited remand for fact-finding and review of an otherwise unpreserved *Brady* claim in the defendant's direct appeal. "[S]tate courts are courts of equal dignity with all of the federal 'inferior courts'—to use the [f]ramers' phrase—and state courts have the same duty to interpret and apply the United States [c]onstitution as [federal courts] do." *Pompey* v. *Broward County*, 95 F.3d 1543, 1550 (11th Cir. 1996). *Floyd* is an example of this state court's considering itself free, in undertaking its duty equal to federal courts, to design processes that we determine are best to protect the constitutional rights of our state's citizens, without concerning ourselves with whether we are in lockstep with other courts.

The majority's response to the analogy I have drawn to *Floyd* is to state the obvious: in *Floyd*, we faced an " 'unusual situation . . . .' " Although the present case presents a different situation that that which led us to order a *Floyd* hearing, I suggest that it is also an "unusual" one, and that similar concerns and the same authority warrant a limited remand. In my view, even if this court declines to formulate a prophylactic rule requiring a translation in every situation such as the present case, our rules and case law permit us to order a translation of the journals in this case to reach an appropriate resolution. In particular, I would rely on the same authority that the court invoked in *Floyd*,

Practice Book § 60-2, which provides this court with discretion to remedy the record in the present case and in other unusual circumstances, so that we do not need to strain to fit a square peg into the round hole of existing case law. Most particularly, Practice Book § 60-2 provides in relevant part that the court may "on its own motion or upon motion of any party . . . (1) order a judge to take any action necessary to complete the trial court record for the proper presentation of the appeal . . . [and] (8) remand any pending matter to the trial court for the resolution of factual issues where necessary . . . ." See also Practice Book §§ 60-1 and 66-5.

For example, in *State* v. *Pollitt*, 199 Conn. 399, 406–407, 415–16, 508 A.2d 1 (1986), this court sua sponte remanded the case to the trial court for further proceedings to augment the factual record and to explore a *Brady* claim after a state's witness had testified during trial about potentially exculpatory information that the state had not disclosed to the defense. In making this decision, we stressed that "we intimate no view at all on the ultimate merits of the issues"; id., 417; but we explained that a remand was necessary because the appellate record was "not . . . amenable to meaningful appellate review" without an evidentiary hearing on the *Brady* claim. Id., 415; see id. ("This is so because of, inter alia, relevant [fact bound] determinations necessary to be made to accomplish ultimate appellate resolution of this issue. This court does not find facts."); see also *State* v. *Gonzales*, 186 Conn. 426, 435–36, 441 A.2d 852 (1982) (remanding case to judge who presided over trial court proceedings for in camera review of witness' statement because materiality of statement could not "be determined by speculation").

Further, my research has uncovered several cases in which federal courts of appeals and the United States Supreme Court have ordered remands for a district

court to supplement the record as necessary to permit a proper resolution of *Brady* claims. See *United States* v. *Griggs*, 713 F.2d 672, 674 (11th Cir. 1983) (remanding case to District Court for in camera review of prosecutor's files because, "although appellants . . . pointed to no specific exculpatory evidence that may have been suppressed," presence of potentially exculpatory statements of witnesses in prosecutor's files that were not produced could reveal "the 'tip of an iceberg' of evidence that should have been revealed under *Brady*"); *United States* v. *Dansker*, 537 F.2d 40, 65 (3d Cir. 1976) (when *Brady* claim first raised on appeal, Court of Appeals concluded that it would be "inappropriate to resolve [the] defendants' *Brady* claim in the first instance" on appeal and remanded case to District Court for that purpose), cert. denied, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Valentine* v. *United States*, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Diaco* v. *United States*, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977); see also *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 43, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987) (upholding lower court decision to remand case in which defendant sought confidential records from state child protection agency for *Brady* purposes when, "[a]t this stage . . . it is impossible to say whether any information in the [agency's] records may be relevant to [the defendant's] claim of innocence, because neither the prosecution nor defense counsel has seen the information, and the trial judge acknowledged that he had not reviewed the full file"); *United States* v. *Stillwell*, 986 F.3d 196, 200–201 (2d Cir. 2021) (remanding case "to the District Court to consider, if not fully determine" whether *Brady* violation occurred because there was "no record below," as *Brady* claim was raised in first instance on appeal); *United States* v. *Alvarez*, 358 F.3d 1194, 1209 (9th Cir.) (vacating con-

viction and remanding case for in camera inspection of probation office's files pertaining to coconspirator witnesses in accordance with *Brady* "[b]ecause neither [the reviewing court] nor the trial court [knew] what it is [the reviewing court was] attempting to review" (internal quotation marks omitted)), cert. denied sub nom. *Valenzuela* v. *United States*, 543 U.S. 887, 125 S. Ct. 126, 160 L. Ed. 2d 148 (2004). In fact, the United States Court of Appeals for the Second Circuit, when faced with potentially exculpatory materials in a different language, has invoked the same practical approach I suggest in the present case. See *United States* v. *Djibo*, 730 Fed. Appx. 52, 55–56 (2d Cir. 2018) (Second Circuit remanded case to District Court for translation of 8000 pages of material from witness' cell phone, including hundreds of pages of conversations in Swahili, after defendant's motion for new trial raised *Brady* claim, because "[t]he translated portions of [the witness'] conversations indicated that there may be information that qualifies as *Brady* . . . material. . . . Without the complete translation . . . it [was] impossible to determine whether [a particular] conversation present[ed] impeachment or exculpatory evidence . . . ."). Outside of the *Brady* context as well, when faced with an unclear or disputed factual record on appeal, this court has remanded cases so that the trial court can make additional findings allowing the trial court or this court to resolve the claim properly. See *Rose* v. *Commissioner of Correction*, 348 Conn. 333, 342 n.6, 342–43, 350, 304 A.3d 431 (2023) (regardless of whether habeas petitioner's ineffective assistance of counsel claim was raised in habeas court, on remand to that court for new hearing and good cause determination under General Statutes § 52-470 (c) and (e), petitioner may raise such claim); *State* v. *Davis*, 338 Conn. 458, 460, 258 A.3d 633 (2021) (remanding case to trial court for hearing regarding potential conflict of interest on part of

defense counsel, notwithstanding defendant's failure to allege nature of claimed conflict in motion to dismiss counsel).

With this case law in mind, I conclude that it is entirely appropriate for this court to remand the present case to the trial court to have the complainant's journals translated.[11] The trial court, the state, or both could then undertake to make an appropriate record consistent with *Brady.*

V

Although the majority never mentions the word "habeas," the clear implication of its holding today is that the court will leave the defendant to pursue his claims concerning whether the journals contain *Brady* material in a habeas court.[12] Postponing resolution of the defendant's claim, however, ignores this court's clearly expressed preference for resolving *Brady* claims on direct appeal whenever possible, even if a limited remand to supplement the record is necessary to flesh out the claim, rather than putting off review until a collateral proceeding years down the road. See *State* v. *Ortiz*, supra, 280 Conn. 713–14 n.17.

---

[11] Another way of looking at what I am suggesting as a way to resolve the present case is through the lens of our supervisory authority cases. First, I would adopt a rule pursuant to our supervisory authority, requiring that prosecutors obtain a certified translation through the Judicial Branch's interpreter and translation services when confronted with evidence in another language before representing to the court whether that evidence contains *Brady* material. See parts II and IV of this opinion. I see this procedural rule as one "that is not constitutionally required" but is "preferable as a matter of policy." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 765, 91 A.3d 862 (2014). Second, I would apply that rule to the defendant's case. Unlike in some cases, however, I do not see a reason to vacate the defendant's conviction but, instead, would apply the rule to the present case by ordering a remand to the trial court for an official translation of the complainant's journals. See *In re Daniel N.*, 323 Conn. 640, 649, 150 A.3d 657 (2016).

[12] The defendant in fact has filed a petition for a writ of habeas corpus that is scheduled for trial in June, 2025, in the judicial district of Tolland.

This path is even more appropriate in the present case because this was a *court trial.* I am particularly at a loss to understand why the majority would not take advantage of Judge Alander's availability and familiarity with this case, given that he was the finder of fact. With no jury to discharge, no similar concepts of finality have kicked in. See *Duart* v. *Dept. of Correction*, 303 Conn. 479, 487–88, 34 A.3d 343 (2012) (posttrial *Brady* motion for new trial implicates standard required for issuing relief that is in part animated by principles of finality of judgment). A remand to the trial court that tried the case would ensure not only the securing of an official translation but, if necessary, would ensure that we would have Judge Alander's view of whether any further exculpatory evidence was "material" to *his* finding of guilt. Judge Alander is uniquely situated in the present case to determine whether anything in the complainant's journals, if exculpatory, would have impacted his determination of guilt under the applicable materiality standard. See *Jones* v. *State*, 328 Conn. 84, 95–96, 177 A.3d 534 (2018); id., 95 (trial judge who previously presided over case "is unquestionably better suited to assess the impact" of new evidence). The procedure I am suggesting would save the parties and the judicial system time and effort, would provide certainty at an earlier time and, for the complainant, would likely be less intrusive.

## VI

To be clear, I do *not*, as the majority suggests, subscribe to the notion that "a *Brady* violation must exist because the nondisclosed portions of the journals necessarily contain impeaching or exculpatory information . . . ." I do not know if the journals contain *Brady* material. On this record, neither do the prosecutors. They are in Spanish. And yet the state has made the representation that they contain no further *Brady* material. Neither the trial court, the parties nor their counsel

know what the journals contain because none of these trial participants has read their contents in a language they can comprehend. The majority appears resigned to the fact that, in the present case and many like it, "it is possible that that [*Brady*] information may *never* come to light." (Emphasis in original.) I am not similarly resigned. In my view, our rules and case law provide the tools to combat such resignation. See Practice Book § 60-2; *State* v. *Gonzales*, supra, 186 Conn. 435. I do not believe it requires much ingenuity for our court to adapt a procedure, similar to *Floyd*, to bring finality to this case.

I would therefore, without vacating the judgment of conviction, remand the case to the trial court to order a certified translation of the complainant's journals, which the court should then review in camera. If the state requests a copy of the translated journals to undertake its own review, consistent with its *Brady* obligation, the trial court should grant that request. If, upon review, the trial court finds that the journals contain further exculpatory evidence, the court should go on to determine whether "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *Kyles* v. *Whitley*, supra, 514 U.S. 433–34. If the trial court finds that there was no further exculpatory evidence or that any evidence was not material, it could make an appropriate record for our further review, if necessary. See *State* v. *Gonzales*, supra, 186 Conn. 436. Accordingly, I respectfully dissent from part II of the majority opinion.